**LewRON TELEVISION, INC., Appellee,**

v.

**D. H. OVERMYER LEASING CO., Inc., Appellant.**

**No. 11928.**

United States Court of Appeals
Fourth Circuit.

Argued March 7, 1968.

Decided Sept. 24, 1968.
Certiorari Denied Feb. 24, 1969.
See 89 S.Ct. 866.

Paul V. Niemeyer, Baltimore, Md., and Russell M. Brown, Washington, D. C. (Joseph H. Young, and Piper & Marbury, Baltimore, Md., and Edmund M. Connery, New York City, on brief), for appellant.

Edward L. Blanton, Jr., Baltimore, Md. (Blanton & McFeely, Baltimore, Md., on brief), for appellee.

Before BOREMAN and WINTER, Circuit Judges, and MacKENZIE, District Judge.

WINTER, Circuit Judge:

In a suit on a contract instituted by LewRon Television, Inc. ("LewRon"), plaintiff, against D. H. Overmyer Leasing Co., Inc. ("Overmyer"), defendant, the district judge granted LewRon's motion for summary judgment and entered judgment for $57,683, the full amount of LewRon's amended claim.[1] Correspondingly, the district judge denied Overmyer's cross-motion for summary judgment. Overmyer appeals, assigning as error the entry of judgment for LewRon and the denial of Overmyer's motion to strike one of LewRon's affidavits filed in the proceeding. We reverse the judgment and remand the case for trial on the merits.

The circumstance which led to the making of the contract was the attempt by Overmyer to organize a new television network. The first program was to be a two-hour show originating from Las Vegas, Nevada. To further its project, Overmyer entered into a contract with LewRon for the leasing of remote color television equipment and facilities.

The contract, dated October 17, 1966, provided that LewRon would lease certain television equipment and provide operating personnel to Overmyer for a period of thirteen weeks, beginning no later than March 20, 1967. Overmyer agreed to pay LewRon the sum of $17,000 per week, commencing April 3, 1967, and also to pay overtime, living expenses and costs of travel of the personnel furnished by LewRon under certain circumstances. Overmyer had the right to postpone the starting date for the use of the equipment and personnel for a maximum period of six months; it had the right to extend the agreement for additional thirteen week periods until April 3, 1974, subject to adjustment of rental payments; and it had the unconditional right to cancel the contract at any time on thirty days' written notice, in which event its liability would be limited to

---

1. The suit was instituted in the Superior Court of Baltimore City. After plea, Overmyer removed the action on the basis of diversity of citizenship and the amount in controversy.

payments due for the balance of the then current thirteen week cycle, provided that if cancellation occurred prior to April 3, 1967, Overmyer would be liable for the payments for the first full thirteen week period.

Subsequently, the parties entered into several "riders" amending the October 17 contract in several regards. The first rider, dated November 22, 1966, refined and restated certain provisions of the October 17 contract, corrected certain typographical errors therein, and made some substantive changes not of particular significance in this proceeding. The second rider, dated February 18, 1967, together with the third rider, dated March 16, 1967, made substantive changes. They may be considered together because the provisions of the third rider which are pertinent here only changed the dates for the doing of certain acts as set forth in the second rider.

The second and third riders gave Overmyer the right to use the facilities prior to the beginning of the initial thirteen week period. Whether used or not Overmyer agreed to pay a daily charge of $2,000, and the riders provided for a deposit of $37,000 in escrow to secure such charges. More importantly for present purposes, the second and third riders reduced Overmyer's liability to LewRon, in the event that Overmyer exercised the option in the October 17 contract to cancel it, if Overmyer exercised its option either before the beginning of the initial thirteen week period or during the initial thirteen week period.[2] If Overmyer elected to cancel at either time it was also given the right to terminate the agreement on seven days' prior written notice, as distinguished from the previous provisions requiring thirty days' prior written notice if cancellation occurred either before or after the initial thirteen week period. Should Overmyer exercise its right to cancel prior to the beginning of the initial thirteen week period, the second and third riders limited its liability to payments due under the agreement prior to the beginning of the thirteen week period, with the provision that "in no event shall LewRon be required to refund any payments theretofore made to LewRon hereunder." Should Overmyer elect to cancel the agreement during the initial thirteen week period, Overmyer's liability was limited to payments " * * * due prior or to the effective date of said 7th day notice, and in no event shall LewRon be required to refund any payments theretofore made to LewRon."

---

2. The full text of the cancellation provisions set forth in the second rider, as amended by the third rider, is as follows:

"13. Any provisions to the contrary notwithstanding, Overmyer shall have the right:

(a) Prior to May 1, 1967 to terminate this agreement on 7 days' prior written notice to LewRon, in which event Overmyer's liability shall be limited to payments due hereunder prior to May 1, 1967, *and in no event shall LewRon be required to refund any payments theretofore made to LewRon hereunder.*

(b) During the 13 week period commencing May 1, 1967 to terminate this agreement on 7 days' prior written notice to LewRon, in which event Overmyer's liability shall be liimited to payments due prior to the effective date of said 7th day notice, *and in no event shall LewRon be required to refund* *any payments theretofore made to LewRon.*

(c) At any time after the 13 week period commencing May 1, 1967 to terminate this agreement on 30 days' prior written notice to LewRon, in which event Overmyer's liability shall be limited to the payments set forth herein for such balance as may remain of the then current 13 week cycle. In such event, LewRon agrees to exert its best efforts to utilize the facilities elsewhere, and all net revenues and savings shall reduce Overmyer's obligations under this subparagraph (c). Net revenue is gross revenue less direct costs of performing the job; and principle [sic] and interest is not included in these direct costs. 'Best efforts' which are required to minimize Overmyer's loss shall not be to the detriment of the other mobile units then owned and operated by LewRon." (emphasis supplied.)

The February 18 rider required Overmyer to pay $60,000 to LewRon as a condition precedent to the effectiveness of the rider; it is undisputed that this sum was paid. According to the terms of the rider, this payment was "the consideration for the rider." The payment was not absolute, however, because the rider also provided with regard to the payment of rent for the initial thirteen week period that LewRon would credit Overmyer with $9,000 against the rental payment for the 10th week, and $17,000 for the rental payments due on the 11th, 12th and 13th weeks. These credits aggregate $60,000. Thus, Overmyer's payment of $60,000 was to be applied fully against the last maturing installments of rent due during the initial thirteen week period when they became due. As later facts will show, it is this aspect of the two riders which is the crux of this case.

Prior to the execution of the February 18 rider, Overmyer was attempting to assign the contract to United Network Company, a limited partnership; but apparently an impediment to the assignment was the substantial liability—the full $221,000 rent for the first full thirteen week period if cancellation occurred before performance began—placed on Overmyer by the initial contract. The February 18 rider was the fruit of a bargaining session between the parties, held in New York City, which began on the evening of February 17 and continued until 4:00 A.M. on the morning of February 18, having as its purposes the attempt to resolve this problem.

Subsequent to the execution of the second rider but prior to the execution of the third rider, Overmyer did assign the contract to United, but LewRon did not agree to a novation so that Overmyer remained liable in the event of a default.[3] United Network did default and

went into bankruptcy. By telegram, dated June 2, 1967, Overmyer exercised its right to cancel the contract.

June 2, 1967, was during the initial thirteen week period of the contract, as amended by the several riders. It is undisputed that, at the time of the effective date of termination, LewRon was entitled to be paid $51,000 in rental payments and $6,683 for the overtime compensation and living expenses of the two supervisors.[4] If the advance payment of $60,000 made by Overmyer at the time the February 18 rider became effective is applied against this liability, Overmyer owes no further sums to LewRon and, indeed, may be entitled to a judgment for the difference between the sum thereof—$57,683—and $60,000. But whether, under the contract documents, the $60,000 may be so applied, is the question for decision.

Recognizing that the fact that both parties had moved for summary judgment did not of itself establish that there was no dispute of material fact or require that judgment should be entered for one side or the other as a matter of law,[5] the district judge concluded that the contract documents provided no basis on which the court could conclude that the $60,000 advance payments could be credited to sums due and owing by Overmyer to LewRon prior to termination. The district judge appears to have rested his decision upon the provision of the February 18 rider that the payment of $60,000 was "the consideration for the rider." In this we think the district judge erred.

■■■ We agree that, simply because both parties moved for summary judgment, it does not follow that summary judgment should be granted one or the other. It is significant that in all of the affidavits in support of and in opposition to the motion and cross-motion for

---

3. United Network also executed the third rider to evidence its assent thereto.

4. It is also undisputed that charges incurred by Overmyer prior to the beginning of the original thirteen week period had been paid.

5. American Fidelity & Cas. Co. v. London & Edinburgh Ins. Co., 354 F.2d 214 (4 Cir. 1965).

summary judgment, including the affidavit which Overmyer contends the district court erroneously refused to strike, there is an almost total lack of reference to the contemporaneous statements of the parties, memoranda or correspondence which passed between them, their subsequent acts or their negotiations prior to agreement on the rider—in short, any extrinsic aids in the construction of the contract documents—to shed light on how the advance payment of $60,000 was to be treated in the event that, as happened here, Overmyer exercised the right of cancellation during the initial thirteen week period. While the intention of the parties is to be drawn primarily from the documents themselves, that is the language that the parties employed, that language is not so clear and unambiguous that the parties' intention as to how the $60,000 payment was to be treated, and whether or not it was to be applied to the liability accruing up to the effective date of cancellation, is apparent.

While the making of the $60,000 payment was unquestionably one element of the consideration for LewRon's agreement to the February 18 rider,[6] it may be argued from the language of the document with equal force that this rider, and the March 16 rider, treated this advance payment simply as security for future liability to be incurred. Certainly, the entire sum of $60,000 was to be credited against the last maturing installments of rent and other payments due during the initial thirteen week period if they fell due. Thus, rather than an absolute payment to induce LewRon to agree to the February 18 rider, the $60,000 may have been an advance payment of sums to become due when performance of the contract was undertaken. The payment of $60,000 as *security* for future rent, when previous liability for future rent was unsecured, would have constituted the payment consideration for the rider to the same extent as absolute payment of that sum.[7] But what was to happen to the $60,000, if, by reason of exercise of the contractual right to cancel, those installments never became due? In that event, was the $60,000 subject to the "no refund" provisions of the riders? The contract documents contain no explicit provision limiting the security solely to the last maturing installments of rent in the event of cancellation before or during the first thirteen week period; nor do they explicitly say that the $60,000 should be applied to anything other than these installments should they mature. Thus, the contract documents do not reflect clearly the intention of the parties as to the application of the $60,000 when, as happened, the right to cancel, before or during the initial thirteen week period, was exercised. Resort must be had to extrinsic aids to construction and the parties given

6. Consideration may also be found, *inter alia*, in Overmyer's promise to pay the daily $2,000 charge referred to in the text, deletion of Overmyer's right to postpone the effective performance date of the contract, deletion of Overmyer's right after performance of the contract had begun to suspend its operation for designated periods at reduced liability, and for forfeiture of Overmyer's initial deposit of $11,050 unless Overmyer elected to extend the contract for at least two thirteen week periods.

7. The district judge stressed that the effect of the February 18 rider was to reduce Overmyer's liability if it cancelled during the initial thirteen week period below its potential liability under like circumstances under the October 17 contract. He appeared to think that this fact proved that the payment of $60,000 was absolute. LewRon pressed on us the same argument. We do not think that the conclusion necessarily flows from the premise. Although the record is slim, Overmyer clearly was experiencing difficulty in accomplishing its project. Although LewRon may have given up a valuable right when it agreed to the February 18 rider, it could well have concluded that had it stood on its original contract it would make it impossible for Overmyer to achieve its objective and thus LewRon would forfeit the promise of an even better life to come. The effect of the February 18 rider to reduce Overmyer's liability if it cancelled is, therefore, only one circumstance to be considered in determining the intention of the parties.

the opportunity to develop them at trial. Particularly is this so when the record shows that the crucial February 18 rider was not entered into lightly but, rather, as a result of a prolonged bargaining session.

Overmyer presses on us the argument that the October 17 contract by its terms provides that it shall be interpreted under the laws of the State of New York, and this provision survived the successive amendments. When McKinney's Consolidated Laws of New York, c. 24–A, General Obligations Law, § 7–101, is considered, there is found, so the argument runs, a legal consideration which requires that summary judgment be awarded Overmyer. Summarized, that statute provides that money deposited or advanced on a contract for the use or rental of *personal* property to be applied upon such contract when due shall continue to be the money of the person making such deposit or advance *"until repaid or so applied"* (emphasis supplied). The statute renders expressly void any contractual provision purporting to waive any provision of the statute. Overmyer concludes that if the $60,000 was security for or prepayment of future rent payments, New York law requires that it remain the property of Overmyer and be applied to its obligations.[8]

Section 7–101 has not been judicially construed in any reported opinion.

New York courts have, however, rendered several decisions involving the counterpart statute, § 7–103, which applies to *real* property. In Mallory Associates v. Barving Realty Co., 300 N.Y. 297, 90 N.E.2d 468, 15 A.L.R.2d 1193 (1949), the New York Court of Appeals held that the real property statute applied to leases of real property located outside of New York where there were significant New York contacts. The case suggests that, absent significant New York contacts, the New York personal property statute may be inapplicable. But on the record before us the presence or absence of significant New York contacts, and particularly the whereabouts of the $60,000 payment is not fully developed.[9] 19 South Main Street Corp. v. Rockland Secretarial School, Inc., 24 A.D.2d 465, 260 N.Y.S. 2d 264 (1965), because of its brevity is inconclusive, but it suggests that application of the real property statute, and by a parity of reasoning the personal property statute, may depend in part on the intention of the parties as to the purpose of the payment.

Resolution of the applicability and meaning of the New York statute must await full development of the facts in the light of the authorities to which we have referred and others which counsel may invoke at the time of trial.[10]

8. Of course, the logical result of this holding would be to permit Overmyer any portion thereof in excess of the $57,683 which it owed. Curiously, in the proceedings below and before us, Overmyer did not seek judgment for the difference.

9. The contract provides that it shall be interpreted by the laws of the State of New York. Presumably, this means *all* of the law of New York, including New York's choice-of-law rules.

10. As an additional aid to determining the parties' intention as to the $60,000, fruitful inquiry may be made as to whether LewRon commingled the $60,000 with other funds and whether Overmyer, if it had knowledge of the commingling, took any action to recover them. Under New York law the consequences for commingling funds to which the statute applies may be grave. The commingler

is "subject to criminal prosecution if * * * he has appropriated the fund to his own use." People v. Horowitz, 309 N.Y. 426, 131 N.E.2d 715 (1956). Since any such commingling is deemed to be a conversion, the depositor is entitled "to immediate recovery of the deposit intact." In re Perfection Technical Services Press, 22 A.D.2d 352, 256 N.Y.S.2d 166 (1965). So strict are the controls upon the deposit that "it may not be used by the depositee as either a forfeiture, liquidated damages or an offset." Freedman v. Washington Square Management Corp., 19 Misc.2d 46, 187 N.Y.S.2d 888, 892 (Sup.Ct.1959), cited with approval in, In re Perfection Technical Services Press, supra. Inaction by Overmyer when it knew of commingled funds might thus be strong evidence that it did not intend the $60,000 to constitute the type of payment to which the statute applied.

Because of our conclusion that summary judgment was inappropriate, it is unnecessary to consider Overmyer's contention with regard to its motion to strike one of LewRon's affidavits.

Reversed and remanded.