**VEIT & COMPANY, INC.,**

v.

**The UNITED STATES.**

No. 01–558C.

United States Court of Federal Claims.

March 27, 2003.

Timothy A. Sullivan, Minneapolis, MN, attorney of record for the plaintiff.

Patricia M. McCarthy, Washington, D.C., with whom was Assistant Attorney General Robert D. McCallum, Jr., for the defendant. Stanley E. Tracey, U.S. Army Corps of Engineers, of counsel.

## OPINION

YOCK, Senior Judge.

This contract case is before the Court on the Plaintiff's Motion for Summary Judgment and on the Defendant's Cross–Motion to Dismiss and for Summary Judgment. For the reasons set forth below, the Plaintiff's Motion for Summary Judgment is denied, the Defendant's Cross–Motion for Summary Judgment is granted, and the Complaint is to be dismissed.

### Background

In 1964, the United States Air Force established the 321st Strategic Missile Wing (the "Missile Wing"). The Missile Wing encompassed more than 10,000 square miles of eastern North Dakota and was under the operational control of Grand Forks Air Force Base, also located in North Dakota. The

purpose of the Missile Wing was to maintain 150 Minuteman Intercontinental Ballistic Missiles during the Cold War years. The Missile Wing was divided into three Strategic Missile Squadrons ("Missile Squadrons"). Each Missile Squadron was further divided into five Strategic Missile Flights ("Missile Flights"). Each Missile Flight comprised 1 launch control facility ("LCF") and 10 launch facilities ("LFs").

In connection with the original construction of the Missile Wing, the United States Government (the "Government") purchased land and obtained easements for the LFs and the LCFs. Each LF was situated upon approximately 1.41 acres of Government-owned land and approximately 100 acres of permanent easements. Each LF included a missile silo, launch facility support building, underground storage tank, gravel parking surface, gravel access road, a hardened UHF antenna, targeting markers, a cathodic protection well, and a perimeter security fence.[1] Each LCF covered approximately four to six acres of Government-owned land and several acres of easements. Each LCF consisted of a launch control center, elevator shaft, launch control support building, antennas, underground fuel storage tanks, paved parking surface, paved road, flag pole, basketball goal, helicopter pad, cathodic protection well, water well, sewage lagoon, and a perimeter security fence.[2]

Another component of the Missile Wing, in addition to 15 LCFs and 150 LFs, was the Outside Cable Communications Plant (the "OCCP"), also called the "hardened intersite cable system." [3] For purposes of the instant case, the chief component of the OCCP, or the "hardened intersite cable system," was a hardened intersite cable (the "HIC"). The HIC is a black coaxial cable consisting of layers of plastic insulation, metal jackets, and annular spaces surrounding a core of individually insulated strands of copper wire.[4] The purpose of the OCCP, or the "hardened intersite cable system," was to provide communications capabilities among the LCFs and their associated LFs. In addition to the land and easements acquired for the construction of the LCFs and the LFs, the Government also obtained easements to lay approximately 1,009 miles of HIC in connection with the OCCP, or the "hardened intersite cable system" (the "OCCP Easements"). The HIC is buried at a depth of 3 to 8 feet within the 16.5–foot wide OCCP Easements.

To comply with Strategic Arms Reduction Treaty limitations upon warheads and launchers, and to comply with the recommendations of the 1995 Defense Base Closure and Realignment Commission, the Department of Defense commenced the process of dismantling particular intercontinental ballistic missile facilities during the 1990s. In the late 1990s, the Air Force proposed to demol-

1. This list of items is taken from the Plaintiff's Proposed Findings of Uncontroverted Fact ("PPFUF"). The defendant offers a more comprehensive list of items comprising each LF. For purposes of this Opinion, the differences between the plaintiff's and the defendant's descriptions of an LF are immaterial. The plaintiff's description is used for the sake of brevity.

2. This list of items is taken from the PPFUF. The defendant offers a more comprehensive list of items comprising each LCF. For purposes of this Opinion, the differences between the plaintiff's and the defendant's descriptions of an LCF are immaterial. The plaintiff's description is used for the sake of brevity.

3. The plaintiff refers to the OCCP in its briefs as the "hardened intersite cable system." Because the drawings relied upon by the parties make occasional reference to the "OCCP," but never to a "hardened intersite cable system," the Court assumes that the defendant's term, "OCCP," is technically the correct one. In an attempt to avoid confusion, however, the Court shall use

both terms whenever it is discussing that component of the Missile Wing consisting of approximately 1,009 linear miles of hardened intersite cable, and laying within a network of OCCP easements, that interconnected the 150 LFs and 15 LCFs that were salvaged and dismantled pursuant to the contract at issue.

4. To clarify grammatical conventions: LFs and LCFs are referred to in the past tense because those facilities have been dismantled. The OCCP, or the "hardened intersite cable system," also is referred to in the past tense, because that component of the Missile Wing no longer functions to provide communications capabilities among the LFs and LCFs, which have been dismantled. The HIC, however, is referred to in the present tense, because that cable currently remains in the ground in the network of OCCP Easements throughout eastern North Dakota. It is the HIC that is the subject of the instant dispute.

ish the 150 Minuteman LF's and 15 Minuteman LCF's in the Missile Wing. In April 1999, the United States Army Corps of Engineers, Omaha District, issued solicitation number DACA45–98–B–0071, seeking bids for the dismantlement of the LCF's and LF's. The solicitation stated that "[t]he estimated construction cost of this project is between $20,000,000 and $30,000,000." (Pl.'s App. at 29.) [5]

Thirteen bids were received and were opened on May 25, 1999. (Pl.'s App. at 32.) The plaintiff was designated the apparent low, responsive bidder. The Government noted that the plaintiff's bid was approximately 51 percent below the Government estimate of $25,173,259 and contacted the plaintiff prior to contract award to make sure that it "fully understands the scope of work." *Id.;* (Def's.App. at 137.) [6]

Contract No. DACA45–99–C–0052 was awarded to the plaintiff on August 19, 1999. The award included the basic contract, Option Nos. 3 through 6 inclusive (dismantlement of the first 50 LF's and 5 LCF's), and Option 7 (salvage, prepare and ship "Save List"), in the amount of $4,270,604. The plaintiff received a Notice to Proceed on August 31, 1999. On March 13, 2000, Option No. 1 was awarded to the plaintiff in the amount of $4,084,784 for dismantlement of another 50 LF's and 5 LCF's. The plaintiff received a modified Notice to Proceed with this work on March 13, 2000. In October 2000, the plaintiff was awarded Option No. 2 in the amount of $3,784,665 for dismantlement' of the final 50 LF's and 5 LCF's.[7]

According to the contract, at the time that the Government delivered the Notice to Proceed to the contractor, the Administrative Contracting Officer (the "Contracting Officer") was to turn over to the contractor 1 LCF and 10 LF's. As the contractor completed work on an LCF or placed an individual LF site in "observation status," the Contracting Officer would turn over an additional LCF or LF, so that the contractor would be able to work continuously on 10 LF's and 1 LCF simultaneously.

Four months after the award of the contract, the plaintiff verbally informed the Government that it desired to salvage all of the HIC within the OCCP, or the "hardened intersite cable system." The plaintiff reduced its intent to writing more than a year later, by letter dated January 8, 2001, notifying the Government of its intent "to salvage the Hardened Intersite Cable System as part of our salvage rights under this contract." (Pl.'s App. at 56.) The Government permitted the plaintiff to salvage the HIC within the perimeter fences of the LF's pursuant to the contract and also might have acquiesced in allowing the contractor to salvage the HIC within the perimeter fences of the LCF's.[8] By letter dated January 31, 2001, however, the Government informed the plaintiff that "[t]he HICS system between your contract sites is government property and not available for your salvage." (Pl.'s App. at 57.)

The plaintiff filed a claim with the Contracting Officer by letter dated April 9, 2001. The claim demanded the right to salvage all of the HIC within the OCCP, or the "hardened intersite cable system," or, in the alternative, $11,856,276, which was the sum that the plaintiff assigned to the salvage value of the copper contained in 2,000 miles of HIC.[9] The Contracting Officer denied the claim in a final decision dated July 2, 2001.

The plaintiff filed its Complaint in this Court on October 1, 2001, asserting that the Contracting Officer was wrong to limit its salvage rights to only that portion of the HIC that lay within the perimeter fences of the

---

5. "Pl.'s App." refers to the appendix to the Plaintiff's Motion for Summary Judgment.

6. "Def.'s App." refers to the Appendix to the Defendant's Opposition to Plaintiff's Motion for Summary Judgment and Defendant's Cross–Motion to Dismiss and for Summary Judgment.

7. One of the 150 LFs and 1 of the 15 LCFs remain intact, albeit nonoperational, for historical purposes.

8. *See infra* note 12.

9. The $11,856,276 figure was based on the plaintiff's original assumption that the OCCP, or the "hardened intersite cable system," contained approximately 2,000 miles of HIC. Subsequently, the plaintiff discovered that the OCCP, or the "hardened intersite cable system," contained approximately 1,009 miles of HIC.

LFs and LCFs. The plaintiff seeks specific performance of the contract and an injunction prohibiting the defendant from disposing of, transferring, surrendering or abandoning the HIC or any OCCP Easements on which the HIC is located; in the alternative, the plaintiff seeks damages in excess of $7 million to be proven at trial. The plaintiff filed its Motion for Summary Judgment on September 10, 2002, and the defendant filed its cross-motion on September 27, 2002. Oral arguments on the cross-motions were heard on March 14, 2003.

## Discussion

### I. Standard of Review

The dispute before the Court in this case involves the interpretation of a Government contract. The interpretation of provisions of a Government contract is a matter of law. *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 997 (Fed.Cir.1996); *Alaska Lumber & Pulp Co. v. Madigan*, 2 F.3d 389, 392 (Fed.Cir.1993). Consequently, issues of contract interpretation generally are well suited to disposition by summary judgment. *Varilease Tech. Group, Inc. v. United States*, 289 F.3d 795, 798 (Fed.Cir.2002); *Hunt Constr. Group, Inc. v. United States*, 48 Fed.Cl. 456, 459 (2001), *aff'd*, 281 F.3d 1369 (Fed.Cir. 2002).

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Rules of the United States Court of Federal Claims; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Material" facts are those that would make a difference in the outcome of a case under applicable law. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. The moving party is not required to produce evidence showing the absence of a genuine issue of material fact; rather, "the burden on the moving party may be discharged by 'showing'-that is, pointing out to the [court]-that *there is an absence of evidence to support the nonmoving party's case.*" *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1563 (Fed.Cir.

1987) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). In reviewing a motion for summary judgment, any disputes over material facts are resolved in favor of the nonmovant. *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed.Cir.1987). "If the evidence [of the nonmovant] is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50, 106 S.Ct. 2505 (citations omitted). Mere denials or conclusory allegations are not sufficient to withstand a motion for summary judgment. *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1116 (Fed. Cir.1985).

Cross-motions for summary judgment are currently before the Court. The assertion by both parties that there is an absence of genuine issues of material fact, however, does not relieve the Court of its responsibility to determine the appropriateness of summary disposition of the case. *See Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed. Cir.1988). "[S]imply because both parties moved for summary judgment, it does not follow that summary judgment should be granted one or the other." *LewRon Television, Inc. v. D.H. Overmyer Leasing Co.*, 401 F.2d 689, 692 (4th Cir.1968). The Court is tasked with evaluating each party's motion on its own merits, taking care to draw all reasonable inferences against the party whose motion is under consideration. *DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314, 1322 (Fed.Cir.2001).

### II. Principles of Contract Interpretation

In interpreting provisions of an agreement, the Court's task "is to determine the intent of the parties at the time they contracted, as evidenced by the contract itself." *Greco v. Department of the Army*, 852 F.2d 558, 560 (Fed.Cir.1988). In achieving this task, "[t]he parties' contemporaneous construction of an agreement, before it has become the subject of dispute, is of course entitled to great weight in its interpretation." *Arizona v. United States*, 216 Ct.Cl. 221, 236, 575 F.2d 855, 863 (1978); *see also Varilease*, 289 F.3d at 799 (asserting that "the intention of a party entering into a contract is determined

by an objective reading of the language of the contract, not by that party's statements in subsequent litigation"). "Provisions of a contract must be construed so as to effectuate the spirit and purpose of the contract." *Thanet Corp. v. United States,* 219 Ct.Cl. 75, 82, 591 F.2d 629, 633 (1979).

The Court reads the agreement as a whole so that, to the maximum extent practicable, a reasonable meaning is given to all of its parts. *Gould, Inc. v. United States,* 935 F.2d 1271, 1274 (Fed.Cir.1991); *see also Thanet,* 219 Ct.Cl. at 82, 591 F.2d at 633 (stating that an "agreement must be considered as a whole, and interpreted so as to harmonize and give meaning to all its provisions"). The Court is to attempt to avoid an interpretation that leaves a portion of the contract "useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result." *Gould,* 935 F.2d at 1274 (quoting *Arizona,* 216 Ct.Cl. at 235–36, 575 F.2d at 863).

"Contract interpretation begins with the plain language of the agreement." *Id.; Unisys Corp. v. United States,* 48 Fed. Cl. 451, 454 (2001). Where contract language is clear and unambiguous, words will be given their plain and ordinary meaning, unless evidence shows that the parties mutually intended and agreed to a different meaning. *Jowett, Inc. v. United States,* 234 F.3d 1365, 1368 (Fed.Cir.2000). Parol, or extrinsic, evidence should not be considered unless the contract is ambiguous. *Greco,* 852 F.2d at 560; *see also City of Tacoma v. United States,* 31 F.3d 1130, 1134 (Fed.Cir.1994) (cautioning that "[o]utside evidence may not be brought in to create an ambiguity where the language is clear").

A contract term is unambiguous when it is susceptible to but one reasonable interpretation; if more than one meaning is reasonably consistent with the contract language, however, then the contract term is ambiguous. *Grumman,* 88 F.3d at 997. An ambiguity may be either patent or latent. A patent ambiguity is one that is "*so* glaring as to raise a duty to inquire." *Newsom v. United States,* 230 Ct.Cl. 301, 304, 676 F.2d 647, 650 (1982). A patent ambiguity may mani-

fest itself as "an obvious error in drafting, a gross discrepancy, or an inadvertent but glaring gap." *WPC Enters., Inc. v. United States,* 163 Ct.Cl. 1, 6, 323 F.2d 874, 876 (1963). "A latent ambiguity, on the other hand, is not glaring, substantial, or patently obvious." *Jowett,* 234 F.3d at 1368 n. 2. "The mere fact that the parties may disagree with regard to the interpretation of a specific provision does not, in and of itself, render that provision ambiguous." *Hunt,* 48 Fed.Cl. at 459; *see also Community Heating & Plumbing Co. v. Kelso,* 987 F.2d 1575, 1578 (Fed.Cir.1993) (observing that "contracts are not necessarily rendered ambiguous by the mere fact that the parties disagree as to the meaning of their provisions"). Whether a contract provision is ambiguous is a question of law. *Grumman,* 88 F.3d at 997.

Whereas a patent ambiguity imposes upon a contractor a duty to seek clarification of the meaning of a provision, a latent ambiguity places "the risk of ambiguity, lack of clarity, and absence of proper warning on the drafting party [i.e., the Government] which could have forestalled the controversy." *Sturm v. United States,* 190 Ct.Cl. 691, 697, 421 F.2d 723, 727 (1970). This policy of placing the risk of latent ambiguity on the drafter is known as the doctrine of *contra proferentum. Contra proferentum* will only operate to benefit the nondrafter, however, if the nondrafting party's interpretation of the contract is reasonable. *Interwest Constr. v. Brown,* 29 F.3d 611, 614 (Fed.Cir.1994); *Blinderman Constr. Co. v. United States,* 39 Fed.Cl. 529, 538 (1997); *see also Community Heating,* 987 F.2d at 1579 n.6 (asserting that "[a] contractor's interpretation of a latent ambiguity will only be adopted if it is found to be reasonable").

### III. *The Parties' Positions*

The plaintiff contends that the contract at issue unambiguously grants it the right to salvage the 1,009 miles of HIC laying in the OCCP Easements. The plaintiff points to an internal bid preparation worksheet drafted by the plaintiff, referencing an unspecified credit for "2,000 MI Horse Cock," to support its position that the plaintiff relied upon the salvage value of all of the HIC within the

OCCP Easements in preparing its bid. In addition, the plaintiff asserts that a contract provision requiring the removal of all topside appurtenances, such as below-grade conduits and cables, unambiguously includes within its scope the removal of the 1,009 miles of HIC laying outside the perimeter fences of the LFs and LCFs. The plaintiff also relies upon a contractual mandate to "salvage items and material to the maximum extent possible" (Pl.'s App. at 37) to argue that it is contractually permitted to salvage for its own account the 1,009 miles of HIC in question. The plaintiff also proffers copies of the recorded land records that evidence the OCCP Easements in support of its position that its salvage rights extend to all HIC located within said easements.

The Government argues that the contract unambiguously does not contemplate the salvage of the 1,009 miles of HIC to which the plaintiff asserts it is entitled. The defendant contends that the contract limits salvage and dismantlement work to defined sites known as "launch facilities" and "launch control facilities," and that the HIC between those discrete sites is outside the scope of the contract. The defendant maintains that the 1,009 miles of HIC in question remains the property of the Government and that the plaintiff has no right to salvage it. The claims are inherently contradictory, leaving the Court with the task of determining which party's "unambiguous" interpretation is correct.

## IV. *Analysis*

The Court attempts to divine the "intent of the parties at the time they contracted, as evidenced by the contract itself." *Greco*, 852 F.2d at 560. Whereas the parties now offer various assertions supported by affidavits, "the intention of a party entering into a contract is determined by an objective reading of the language of the contract, not by that party's statements in subsequent litigation." *Varilease*, 289 F.3d at 799. The question posed is whether the parties intended, at the time they contracted, to include within

the scope of work the removal of the 1,009 miles of HIC that lay within the OCCP Easements. The Court reviews several things in answering that question: the plain language of the contract provisions, the meanings mutually assigned by the parties to material terms of the contract, contract drawings, well-accepted principles of contract interpretation, and canons of contract construction.

### A. *The Plain Language of the Contract*

The Court begins, as it must, with the plain language of the contract. *Gould*, 935 F.2d at 1274. The contract specifications at issue are promulgated in Section 02050 of the contract, entitled "Demolition." Part 1.3 of the Demolition Section, entitled "General Requirements," sets forth the scope of the dismantlement work:

> The work includes demolition, salvage of identified items and materials (save list and must salvage items), special environmentally safe disposal of materials identified, and removal of resulting rubbish and debris. * * * In the interest of conservation, salvage shall be pursued to the maximum extent possible; salvaged items and materials shall be disposed of as specified. Furnish all plant, labor, material and equipment to salvage and dismantle one hundred fifty (150) Minuteman InterContinental Ballistic Missile (ICBM) Launch Facilities (LF) and fifteen (15) Launch Control Facilities (LCF). * * * See Bidding schedule for sites included in the basic and options.

(Def.'s Supp.App. at 435.)[10] The Bidding Schedule referenced in this section provides for the dismantlement of 3 LCFs and 30 LFs in the basic period, 5 LCFs and 50 LFs in Option 1, 5 LCFs and 50 LFs in Option 2, and 2 LCFs and 20 LFs in Option 3. (Def.'s Supp.App. at 166–69.) The work is specified in further detail in Part 3 of the Demolition Section, entitled "Execution." The pertinent provisions of that Part are excerpted below:

> **3.1.1. LAUNCH FACILITY.** Work to be performed at each LF shall include, but not be limited to: removal of all save list

---

**10.** "Def.'s Supp.App." refers to the appendix attached to the Defendant's Reply to Plaintiff's Opposition to Defendant's Cross–Motion to Dis-

miss and for Summary Judgment and Motion for Leave to Submit Supplemental Declaration.

items, disposition off site of salvage items as indicated in Paragraph 3.4 "Disposition of Material" and as desired by the Contractor; removal of all topside appurtenances such as pullboxes, light poles, below grade conduits and cables, cathodic protection controls, concrete pads/markers, antenna poles and bases, removal of mechanical piping to conduit; demolition of the headworks to the depth indicated; and removal of other structures as shown on the drawings or defined in the specification. * * * The security fence shall remain intact.

\* \* \* \* \* \*

### 3.1.2. LAUNCH CONTROL FACILITY.

Removals of items not specified or indicated shall not be done unless approved by the Contracting Officer. Work to be performed at each LCF under this project shall include, but not be limited to: removal of all save list and salvage items as specified in Section 3.4 Disposition of Material and as desired by the Contractor; and dismantlement and disposal, or fill and seal, of the topside features within and outside the security fence as specified. Topside features include items such as intake and exhaust airshafts, antenna foundations, sewage lagoons, and piping, and removal of cathodic protection controls.
* * *

\* \* \* \* \* \*

### 3.4. DISPOSITION OF MATERIAL

Title to material and equipment to be demolished, except Government salvage and historical items, is vested in the Contractor upon receipt of notice to proceed. The Government will not be responsible for the condition, loss or damage to such property after notice to proceed.

### 3.4.1. Salvageable Items and Material

Contractor shall salvage items and material to the maximum extent possible.

(Def.'s Supp.App. at 438–39.)

The contract provisions recited above require the contractor to salvage for the Government all items specified on the Government's "save list." Title to material and equipment to be demolished, however, pass to the contractor upon the contractor's receipt of the notice to proceed. Although not to be saved for the Government, the contract nonetheless calls for the contractor to salvage items and material that would otherwise be demolished to the "maximum extent possible"-the contractor would own all of the items and material that are to be so salvaged because title to those items passes to the contractor when the contractor receives notice to proceed.

The HIC within the OCCP Easements was not specified on the Government's "save list" and was not designated as an historical item. Consequently, if the HIC within the OCCP Easements was an item to be demolished, then title to all such HIC passed to the plaintiff at the time the plaintiff received notice to proceed, and the plaintiff would be entitled, indeed required, to remove all such HIC and to salvage it "to the maximum extent possible."

### B. *Definitions of Terms Adopted by the Parties*

 In interpreting a contract, words will be given their plain and ordinary meaning, unless evidence shows that the parties mutually intended and agreed to a different meaning. *See Jowett,* 234 F.3d at 1368. The plain language of the contract calls for the contractor to "[f]urnish all plant, labor, material and equipment to salvage and dismantle one hundred fifty (150) Minuteman InterContinental Ballistic Missile (ICBM) Launch Facilities (LF) and fifteen (15) Launch Control Facilities (LCF)." (Def.'s Supp.App. at 435.) The contract does not provide succinct definitions of the terms "launch facility" and "launch control facility," but the parties' respective proposed findings of uncontroverted fact reveal that the parties effectively agree on the meanings of those terms. Accordingly, the Court shall be guided by the descriptions of those terms as assigned by the parties in their proposed findings of uncontroverted fact.[11]

---

11. As explained in notes 1–2, *supra,* the differences between the plaintiff's and the defendant's

descriptions of the terms "LF" and "LCF" are immaterial for purposes of this Opinion. The

■ The plaintiff describes each launch facility as being situated on approximately 1.41 acres of Government-owned land, which "was connected to permanent easements." (PPFUF ¶ 4.) The plaintiff further explains that "[t]he unmanned launch facilities each included a missile silo, launch facility support building, underground storage tank, gravel parking surface, security fence, gravel access road, cathodic protection well, hardened UHF antenna, and two targeting markers." *Id.* ¶ 5.

The plaintiff describes each launch control facility as covering "approximately four to six acres of government-owned land and several acres of easements." *Id.* ¶ 7. According to the plaintiff, each launch control facility "consisted of a launch control center, elevator shaft, launch control support building, antennas, underground fuel storage tanks, paved parking surface, flag pole, basketball goal, security fence, paved road, cathodic protection well, water well, sewage lagoon and helicopter pad." *Id.* ¶ 6.

The OCCP, or the "hardened intersite cable system," is conspicuously absent from the parties' descriptions of the components of the LFs and the LCFs. The absence is explained by the parties' understanding of the composition of the Missile Wing. The plaintiff asserts that "[t]he 321st Strategic Missile Wing included, among other things, nuclear missile launch facilities, launch control facilities, and the hardened intersite cable system providing communications between the facilities." *Id.* ¶ 1. As will become evident below, the importance of the parties' mutual understanding of the composition of the Missile Wing is hard to overstate. Central to the resolution of this dispute is the mutual understanding of the parties that the OCCP, or the "hardened intersite cable system," was a component of the Missile Wing that was separate and apart from the LFs and the LCFs.

The descriptions mutually assigned by the parties to the terms "LF," "LCF," and "Missile Wing" seem to this Court to undermine significantly the plaintiff's position in this action. If the contract called for the salvage and dismantlement of the entire Missile Wing, then perhaps the plaintiff would have a strong argument that the OCCP, or the "hardened intersite cable system," was part and parcel of the scope of the contract. The plain language of the contract, however, does not call for the dismantlement and salvage of the entire Missile Wing-it merely, and unambiguously, calls for the salvage and dismantlement of 150 LFs and 15 LCFs. Although the OCCP, or the "hardened intersite cable system," was a component of the Missile Wing, it was separate from the LFs and LCFs and was not a part of the LFs and LCFs themselves. Therefore, a contract for the dismantlement and salvage of 150 LFs and 15 LCFs necessarily excludes from its scope the 1,009 miles of HIC contained within the OCCP, or the "hardened intersite cable system."

The Court is to attempt to read the agreement as a whole and to interpret the agreement "so as to harmonize and give meaning to all its provisions." *Thanet,* 219 Ct.Cl. at 82, 591 F.2d at 633. The contract interpretation proposed by the plaintiff, that the dismantling and salvage of 150 LFs and 15 LCFs includes within its scope the removal of the OCCP, or the "hardened intersite cable system," is incompatible with the descriptions of "LFs," "LCFs," and "Missile Wing" propounded by the plaintiff itself. Adoption of the plaintiff's interpretation would, therefore, prevent harmonization of all of the provisions of the contract. Not surprisingly then, the Court finds the plaintiff's self-contradictory interpretation of the contract to be unreasonable.

The scope of the contract is unambiguously limited to the dismantlement and salvage of 150 LFs and 15 LCFs. Because the scope of work is unambiguous, the Court is precluded from considering parol evidence on the matter. *City of Tacoma,* 31 F.3d at 1134. Accordingly, the plaintiff's extrinsic bid preparation document referencing an unspecified credit for "2000 MI horse cock" is not to be considered, as it would introduce an ambiguity where none exists. *See Interwest Constr.,*

---

defendant also does not controvert the plaintiff's description of the "Missile Wing." Accordingly, the Court adopts the descriptions of "launch facility," "launch control facility," and "Missile Wing" as set forth in the Plaintiff's Proposed Findings of Uncontroverted Fact.

29 F.3d at 615 (stating that " 'extrinsic evidence to change the terms of a contract that is clear on its face' may not be considered by a tribunal") (citation omitted).

## C. The Relationship Among the OCCP Easements, LFs and LCFs

The plaintiff also relies upon language in Section 3.1.1. of Part 3 of the Demolition Section of the Contract, which details execution of the work at each LF. The specific language states that "[w]ork to be performed at each LF shall include, but not be limited to: * * * removal of all topside appurtenances such as pullboxes, light poles, below grade conduits and cables * * *." (Def.'s Supp.App. at 438.) It is not disputed that HIC is a cable. It is also undisputed that the cited language permitted the plaintiff to salvage the HIC within the perimeter fences of each LF. The dispute centers on whether or not the contract permitted the plaintiff to salvage the HIC outside the perimeter fences and throughout the entire network of the OCCP Easements.[12]

The plaintiff's position, that it is entitled to salvage 1,009 miles of HIC outside the perimeter fences of the LFs, would require the Court to interpret expansively the phrase "at each LF" to include all OCCP Easements in which the 1,009 miles of HIC lay. Under such an expansive interpretation, the scope of the "work at each LF" would require removal of all topside appurtenances, including all "below grade conduits and cables," within the OCCP Easements. If the contract could reasonably be interpreted in such a manner, the plaintiff would be required to remove all of the HIC within the OCCP Easements but would be entitled to salvage such HIC for its own account "to the maximum extent possible."

Including the OCCP Easements within the scope of the phrase "at each LF," however, does not comport with a reasonable interpretation of the contract. As explained above, the plaintiff itself asserts that the OCCP, or the "hardened intersite cable system," is a component of the Missile Wing, separate and apart from the LFs and LCFs. The plaintiff asserts that the Government "purchased or obtained easements on which to place the HICS cable" (PPFUF ¶ 2) and that "there are approximately 1,009 miles of HICS cable connecting the launch control and launch facilities." (PPFUF ¶ 11.) Based on this understanding of the components of the Missile Wing, the OCCP Easements can not reasonably be considered to be within the scope of the phrase "at each LF." As the plaintiff points out, the "HICS cable" interconnects the various LFs and LCFs. If the OCCP Easements were part and parcel of the LF sites, there would be no "connecting" of the LFs and LCFs required at all-the entire network would meld into one giant site, rendering all references in the contract to work at "each" of 150 LFs and at "each" of 15 LCFs superfluous. Indeed, there would be no reason to count up the number of LFs or LCFs at all the contract would merely require the dismantlement and salvage of the

---

**12.** Curiously, while below-grade conduits and cables are specifically mentioned as topside appurtenances at each LF, they are not specifically mentioned as topside appurtenances at each LCF. For LCFs, "[t]opside features include items such as intake and exhaust airshafts, antenna foundations, sewage lagoons, and piping, and removal of cathodic protection controls." (Def.'s Supp.App. at 438.) "Removals of items [at LCFs] not specified or indicated shall not be done unless approved by the Contracting Officer." *Id.* Consequently, an objective reading of the contract reveals that removal of below-grade conduits and cables is contractually required at each LF, but that removal of conduits and cables at each LCF is at the discretion of the Contracting Officer. In a response to an interrogatory, the Government stated that the plaintiff was permitted to salvage, pursuant to the contract, those portions of the HIC that were within the perimeter fencelines of the LFs and the LCFs. (Pl.'s App. at 52.) At oral argument, however, the Government stated that the answer to the interrogatory was in error and that the plaintiff was not permitted to salvage the HIC within the perimeter fences of the LCFs pursuant to the contract. For purposes of this Opinion, the Court assumes that the Contracting Officer consented to the removal of the HIC within the perimeter fences of the LCFs, because neither of the parties' instant motions puts that relatively small quantity of HIC at issue. What is at issue is the 1,009 miles of HIC outside the perimeter fences of the LFs and the LCFs. It is undisputed that the Contracting Officer did not consent to the removal of the HIC outside the perimeter fences, and thus the only question remaining is whether the contract language itself requires the Government to permit the plaintiff to salvage the 1,009 miles of HIC at issue.

entire Missile Wing. Because the plaintiff's position would render meaningless so many specific references in the contract to "each" of 150 LFs and "each" of 15 LCFs, the Court declines to adopt its expansive, and unreasonable, interpretation. *Gould*, 935 F.2d at 1274 (the Court is to avoid an interpretation which leaves a portion of the contract meaningless or superfluous); *Thanet*, 219 Ct.Cl. at 82, 591 F.2d at 633 (an agreement is to be interpreted so as to give meaning to all its provisions).

Contract drawings further confirm the unreasonableness of including the OCCP Easements within the geographic scope of "each LF." Two drawings are particularly pertinent to the issue at hand. Sheet P2.01 is entitled "Launch Control Facility (LCF) Typical Site Plan and Notes." (Def.'s App. at 157.) Sheet P2.02 is entitled "Typical LF Site Layout Removal Plan." (Def.'s App. at 156.) The titling of these drawings as "site" plans is instructive as to what an LF site and an LCF site were considered to be at the time the parties contracted.

In addition to depicting expressly the typical LCF site and the typical LF site, these sheets describe various contract specifications for dismantling a typical LCF and a typical LF. Perimeter security fences are depicted on both site-plan drawings. Notably, items of work and work areas external to the perimeter fences are expressly depicted on the site-plan drawings. The items specifically shown external to the fence on the LCF site plan are: a heliport area, a 10-foot wide access road, M.F. antenna warning signs, an M.F. antenna area, a cathodic protection well and cathodic protection boxes, a sewage lagoon, a drain pipe between the fence and the sewage lagoon, utility company transformer pole, Air Force power pole, and an existing potable water line extending from the perimeter fence line. The items outside the fence on the LF site plan are: azimuth survey markers, M.F. antenna warning signs, a dipole antenna area, a control marker pier, access roads, Air Force and utility company power poles, a cathodic protection well, concrete pad and boxes.

It is clear from Sheets P2.01 and P2.02 that the LF and LCF sites included areas outside their respective perimeter fences. Conspicuously absent from these site-plan drawings, however, is any depiction of, or reference to, the OCCP Easements. Also missing is any specification within the contract, or notation upon the site plans, regarding HIC that extended beyond the perimeter fences. The complete silence regarding the OCCP Easements and the HIC external to the perimeter fences, in contrast to the express depiction and corresponding specifications for other items of work and work areas external to the perimeter fences, compels the Court to invoke the doctrine of *expressio unius est exclusio alterius*. That doctrine holds that "[w]here certain things are specified in detail in a contract other things of the same general character relating to the same matter are generally held to be excluded by implication." *Smelser v. United States*, 53 Fed.Cl. 530, 539 (2002). In other words, because work areas and items of work external to the perimeter fences of the LFs and LCFs are expressly depicted on the typical site plans and specified within the contract specifications, the absence of any depiction of the OCCP Easements or specifications regarding HIC external to perimeter fences is deemed to mean that the 1,009 miles of HIC within the OCCP Easements outside the perimeter fences were intentionally excluded from the scope of the contract.

Three other drawings are pertinent to the immediate issue. The plaintiff relies upon three pages of plans, dated 1963 and provided to bidders stamped with the legend "For Information Only," to support its interpretation that the contract included dismantlement and salvage of the 1,009 miles of HIC interconnecting the LFs and LCFs. Sheets 444 and 445, called "Launch Facility Electrical Area Plot Plans," each depict a conduit, labeled "For OCCP," that runs from the launcher to a point outside the LF perimeter fence. (Pl.'s App. at 140–41.) Sheet 412 depicts the Electrical Area Plot Plan for an LCF. *Id.* at 139. The latter drawing depicts a profile of OCCP conduits, through which the HIC presumably runs, and includes a notation to "continue conduits beyond fence."

An objective reading of the drawings reveals only that the OCCP conduits extend

beyond the perimeter fences of the LCFs and LFs. This is not surprising, particularly taken in context with the site-plan drawings and the plaintiff's own asserted understanding of the function of the OCCP, or the "hardened intersite cable system." The plaintiff asserts that the OCCP, or "hardened intersite cable system," served to interconnect the LCFs and LFs. Obviously, the HIC running through the OCCP, or the "hardened intersite cable system," would have to depart each LF and LCF at some point in order to wend its way to the next site. It is this interconnecting function of the HIC that makes the references to the fences on the drawings notable: there would be little reason to mention the perimeter fences at all in connection with the OCCP conduits if the fences did not constitute the point at which the conduits (and the HIC that presumably resides within them) departed the LFs and LCFs. Viewing the 1963 as-built drawings in context with the 1996 site-plan drawings, it is again notable that OCCP conduits and HIC external to the perimeter fences are not depicted on the site-plan drawings, even though other items of work external to the fences are shown. This glaring absence again compels the Court to invoke *expressio unius est exclusio alterius* to conclude that the HIC laying in the OCCP Easements external to the perimeter fences of the LFs and LCFs was intentionally excluded from the scope of the contract.

As previously mentioned, Sheets P2.01 and P2.02 not only depict the typical LF and the typical LCF, but they also expressly set forth many of the contract specifications. The contract specifications spell out in detail the removal of a great number of items external to the perimeter fences of the LFs and LCFs. For example, Sheet P2.02 depicts locations of M.F. Antenna Warning Signs and specifies that the contractor is to "remove signs." (Def.'s App. at 156.) Sheet P2.01 depicts the sewage lagoon, specifies that the contractor is to "remove barbed wire fence" surrounding the lagoon, and refers the contractor to Section 02211A of the contract, which spells out the detailed specifications for removal of the sewage lagoon. The Court is struck by the comprehensive depiction of items large and small external to the perimeter fences, along with specifications on what to do with each item. The Court also notes, in stark contrast, that nowhere on the drawings, in the contract specifications, or elsewhere in the contract documents, including the Bidding schedule submitted by the bidders, is removal of 1,009 miles of off-site HIC addressed. The absence of such a major undertaking from the contract specifications is glaring: the plaintiff itself estimates that removal of the HIC at issue would take 167 days, assuming 4 crews working 8 hours a day each. (Pl.'s App. at 62.) The absence of this daunting task from the Bidding schedule, drawings and contract specifications, where much smaller tasks were specified in detail, again compels the Court to apply the doctrine of *expressio unius est exclusio alterius* to conclude that the removal of 1,009 miles of HIC within the OCCP Easements was not contemplated by the parties to be within the scope of the contract.

The OCCP Easements, then, cannot reasonably be included within the scope of the phrase "at each LF." The site-plan drawings unambiguously depict the geographic scope of the typical LF and LCF, each of which excludes the OCCP Easements. In addition, the OCCP Easements are not shown on any other contract drawing submitted to the Court and are not incorporated by reference by any other provision of the contract. Accordingly, the documents in the land records of various North Dakota counties that evidence the OCCP Easements constitute parol evidence. The Court is precluded from considering parol evidence when, as here, there is no contractual ambiguity that requires its invocation. *Greco*, 852 F.2d at 560.

#### D. *The Plaintiff's Miscellaneous Arguments*

The plaintiff raises two additional arguments in support of its position. Those arguments are generally answered by the analysis above, but nonetheless are also addressed briefly below.

First, the plaintiff asserts that the provision requiring the contractor to "salvage

items and material to the maximum extent possible" grants the plaintiff the right to salvage the 1,009 miles of HIC at issue. That provision, however, must be read in the context of the rest of the agreement so that a reasonable meaning is given to all parts of the contract. *See Dalton v. Cessna Aircraft Co.,* 98 F.3d 1298, 1305 (Fed.Cir.1996) (explaining that "[w]e read the language of a particular contractual provision in the context of the entire agreement"). The salvage rights of the contractor must necessarily be limited to the scope of the work provided for in the contract. Because the language of the agreement unambiguously calls only for the salvage and dismantlement of LFs and LCFs, the salvage right cannot be construed to extend to items located off of those sites, such as the HIC located in the OCCP Easements. To read otherwise would be to render meaningless the express limiting references to the LFs and the LCFs, and the Court is to avoid an interpretation that leaves words "useless, inexplicable, inoperative, void, insignificant, [or] meaningless * * *." *Gould,* 935 F.2d at 1274.

Second, the plaintiff relies on the contractual provision that "transfers title to material and equipment to be demolished not on the Government's save lists to the contractor upon receipt of the notice to proceed" to assert that it is entitled to HIC within the OCCP Easements. (Pl.'s Opp. to Def.'s Cross–Mot. at 8.) Such an interpretation, however, would render meaningless the clause "to be demolished." Nowhere does the contract specify that 1,009 miles of HIC within the OCCP Easements is to be demolished, and thus nowhere does the contract pass title to that 1,009 miles of HIC to the plaintiff. The plaintiff, in fact, does not contend that the contract called for demolition of all of the HIC in question-such an interpretation, while permitting the plaintiff to salvage 1,009 miles of HIC for its own account, would, of course, also require that the plaintiff remove all 1,009 miles of HIC. (Def.'s Supp.App. at 438) (requiring the contractor to remove *all* topside appurtenances, such as below-grade conduits and cables) (emphasis added). Rather, the plaintiff seems to say that the contract's silence with respect to such HIC should be interpreted as passing

title to only so much of the 1,009 miles of HIC as the contractor deems economically feasible to salvage. (Pl.'s Mot. for Summ. J. at 21.) No provision of the contract can reasonably be construed to support such a "pick-and-choose" interpretation, and for this additional reason the Court finds the plaintiff's interpretation to be unreasonable.

Finally, it is worthy to note that neither party posited, and the Court has not found, that any provision of the contract at issue is ambiguous. Even if the contractual provisions contained a latent ambiguity, however, the Court would not adopt the plaintiff's interpretation. The doctrine of *contra proferentum* would only benefit the plaintiff if the plaintiff's interpretation was reasonable. *See Community Heating,* 987 F.2d at 1579 n.6 (asserting that "[a] contractor's interpretation of a latent ambiguity will only be adopted if it is found to be reasonable"). As already noted in many places, the interpretation propounded by the plaintiff is unreasonable. Likewise, if the contract contained a patent ambiguity, the plaintiff would have had the obligation to seek clarification of such ambiguity from the Government prior to relying on its own subjective interpretation. Having not done so, the plaintiff would be estopped from relying on the ambiguity now.

For all of the aforementioned reasons, the Court concludes that the plaintiff's interpretation of the contract at issue is unreasonable. There is an absence of evidence within the four corners of the unambiguous document itself to support the plaintiff's case. Such absence is all that is required to be shown by the defendant to meet its burden in support of its cross-motion for summary judgment. *Sweats Fashions,* 833 F.2d at 1563.

## CONCLUSION

In summary, the only reasonable and consistent interpretation of the contract is the one offered by the defendant. The plaintiff was required to dismantle 150 LFs and 15 LCFs within the Missile Wing. The 1,009 linear mile OCCP, or "hardened intersite cable system," being a component of the

Missile Wing separate and apart from the LFs and LCFs, was not part of the LFs or LCFs, and thus was excluded from the scope of the contract. Because the contract does not require the 1,009 miles of HIC within the OCCP Easements to be demolished, title to such HIC did not pass to the plaintiff, and thus the plaintiff has no right to salvage such property, which remains the property of the Government. Accordingly, the plaintiff's motion for summary judgment is denied. The defendant's cross-motion for summary judgment is granted. The Clerk of the Court is directed to enter judgment accordingly and to dismiss the Complaint.

Each party is to bear its own costs.