**SOUTHERN CALIFORNIA EDISON, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 02–1953–C.

United States Court of Federal Claims.

Oct. 24, 2003.

Charles D. Siegal, Munger, Tolles & Olson, LLP, Los Angeles, California, for plaintiff. With him on the brief were Leon Bass and Marsha Hymanson.

Martin F. Hockey, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Assistant Attorney General Robert D. McCallum, Jr., and David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., and Jon D. Wright, Office of the General Counsel, Bonneville Power Administration, Portland, Oregon.

## OPINION AND ORDER

LETTOW, Judge.

This contract case arises out of the California energy crisis of 2000. It is before the Court on defendant's motion to dismiss for failure to state a claim upon which relief can be granted, pursuant to Rule 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC"). The plaintiff, Southern California Edison ("SCE"), is a public electric utility company engaged in the business of purchasing, transmitting, and distributing electric energy to approximately eleven million customers in central and southern California. Compl. ¶ 13. SCE alleges that the Bonneville Power Authority ("BPA"), a federal entity within the Department of Energy engaged in the sale of energy generated at federal hydroelectric dams in the Pacific Northwest, breached a contract with SCE for the supply of electricity at various times in the 1990s and particularly during the California energy crisis in the summer of 2000. The motion has been fully briefed, and a hearing was conducted on September 22, 2003.

Several aspects of this case are influenced, although not directly affected, by the complex statutory matrix that governs BPA and its operations. Four separate acts constitute the principal components of this framework: the Bonneville Project Act of 1937, as amended, 16 U.S.C. §§ 832–832m; the Pacific

Northwest Consumer Power Preference Act of 1964, as amended, 16 U.S.C. §§ 837–837h; the Pacific Northwest Federal Transmission System Act of 1974, as amended, 16 U.S.C. §§ 838–838*l*; and the Pacific Northwest Electric Power Planning and Conservation Act of 1980, as amended ("Northwest Power Planning Act"), 16 U.S.C. §§ 839–839h. The contract itself makes no reference to these statutes, and the parties have given them short shrift in their briefing and argument. However, because provisions in the statutes regarding judicial review have a bearing on this Court's subject matter jurisdiction, *see, e.g., M–S–R Pub. Power Agency v. Bonneville Power Admin.,* 297 F.3d 833, 840–41 (9th Cir.2002); *City of Burbank v. United States,* 273 F.3d 1370, 1377–81 (Fed.Cir. 2001), this Court *sua sponte* has undertaken an analysis of the statutory context in jurisdictional terms.

Accordingly, the discussion which follows addresses briefly the background of the case and then turns to the Court's subject matter jurisdiction and the standard for decision. Only thereafter are the contractual claims evaluated. In a nutshell, the Court concludes that it has jurisdiction over SCE's claims and that the government's motion to dismiss must be denied because SCE has stated potentially viable causes of action in its complaint and is entitled to offer evidence to support its claims.

## BACKGROUND[1]

In July 1988, BPA and SCE entered into a sale and exchange agreement ("Contract") that set forth terms under which BPA would sell to or exchange with SCE electrical energy and capacity[2] until 2009.[3] Compl. ¶¶ 1 and 15; Contract § 1(b). The Contract was designed to operate in one of two modes. In the "sale" mode, it was a simple sales contract—BPA sold energy to SCE at prices and quantities established in the contract. In the "exchange" mode, SCE received a limited amount of energy from BPA, but instead of paying cash for that energy, SCE was required to deliver back to BPA almost twice the amount that it received, albeit at a time of year (*e.g.,* the winter) when there was ordinarily an excess of generating capacity in southern California. Compl. ¶ 1.

The sale mode was intended to be the default operating condition, but the Contract could be converted to exchange mode for a twelve-month period for a number of reasons that included the exercise of certain options available to the parties, Contract § 6(a), an agreement by the parties, *id.* § 6 (preamble), or a determination that BPA would experience a "surplus firm power insufficiency" for the coming year. *Id.* § 6(b). At the heart of this case is BPA's conversion of the Contract to exchange mode in the summer of 2000, purportedly based upon a determination of insufficiency.

Respecting conversion to the exchange mode because of an insufficiency, the Contract provided that "[t]he sale of surplus firm power shall convert in whole or in part to an exchange if Bonneville has a surplus firm power insufficiency as determined in the PNW Coordination Agreement planning process." *Id.* § 6(b). The "PNW Coordination Agreement planning process" was conducted annually, based upon the "PNW Coordination Agreement," which the Contract defined as "the contract among Bonneville [and] Pacific Northwest (PNW) generating entities, providing for coordinated operation of resources, designated as Contract No. 14–03–48221, as amended or replaced." *Id.* § 3(p).[4]

---

1. The factual setting for the case is drawn from SCE's complaint ("Compl.") and accompanying documents, including the Contract with its related exhibits and SCE's administrative claim filed with BPA's contracting officer ("Claim").

2. " 'Capacity' is the commitment to make energy available up to a designated amount, while 'associated energy' is the actual energy received." Compl. ¶ 17.

3. By its terms, the Contract was to remain in effect until May 31, 2009, unless earlier terminat-

ed by the parties under specific contractual provisions. Compl. ¶ 1(b). The Contract is no longer in effect, having been terminated in July 2001. Hr'g Tr. at 6–8.

4. The Coordination Agreement was initially adopted in the 1960s to enable the United States to fulfill its obligations under a treaty with Canada regarding the flow of water in the Columbia River System. *See generally* Bonneville Power Administration, U.S. Department of Energy, *Columbia River Power for the People: A History of Policies of the Bonneville Power Ad-*

Under the PNW Coordination Agreement, the water storage and power production rights and obligations of dam operators on the Columbia River and its tributaries are determined for each operating year. Compl. ¶ 22; Hr'g Tr. at 27–28.[5] The Complaint avers that the PNW Coordination Agreement "outlines water storage and power transfer rights and obligations for regional hydroelectric coordination for the next Operating Year. The [PNW Coordination Agreement] does not attempt to manage parties' day-to-day operations." Compl. ¶ 22.

Under Subsection 6(b) of the SCE–BPA Contract, BPA was required to give SCE preliminary notices in April and July of BPA's assessment of the likelihood that BPA would have an insufficiency for the coming year, based upon the projections issued for that year pursuant to the PNW Coordination Agreement. Contract § 6(b)(1)-(2)(B). By August 10 of each year, BPA was required to give SCE final notice of whether BPA had sufficient power to continue the Contract in the sales mode. *Id.* § 6(b)(3). "If Bonneville does not have sufficient energy … then the power sale shall convert to an exchange." *Id.* § 6(b)(3)(C). SCE avers that the contract conversion term was keyed to the PNW Coordination Agreement planning process to ensure that the annual decision regarding BPA's power availability would be made on an objective basis. Compl. ¶¶ 2, 21.

During the first two years of the Contract's operation (*i.e.*, the 1989–1990 and 1990–1991 operating years), BPA converted the Contract to the exchange mode due to determinations of insufficiency. Compl. ¶ 27; Hr'g Tr. at 15. In the subsequent operating years between 1991 and 2000, BPA converted to exchange mode twice.[6] Claim at 6; Hr'g Tr. at 15. SCE alleges that during this period, the PNW Coordination Agreement planning process showed or should have shown that BPA had a power insufficiency for a number of additional years beyond those two. Compl. ¶ 34.

In 1995 the U.S. National Marine Fisheries Service generated a report titled "Endangered Species Act—Section 7 Consultation: Biological Opinion: Reinitiation of Consultation on 1994–1998 Operation of the Federal Columbia River Power System and Juvenile Transportation Program in 1995 and Future Years" ("1995 Biological Opinion" or "1995 Bio. Op.").[7] The 1995 Biological Opinion sets out recommended flows through the dams on the Columbia and Snake Rivers and their tributaries to protect a variety of fish species in the rivers, as well as guidance for promulgating annual water-flow and power-production regulations. 1995 Bio. Op. at 96–111. SCE alleges that, in effect, the 1995 Biological Opinion required the reduction, from 42 months to 8 months, of the "critical period" used in determining the amount of water that dam operators would be allowed to let flow through their dams. Compl. ¶¶ 3, 33; Claim at 8–9. The resulting reduction in the amount of energy that could be produced, according to SCE, virtually assured that BPA would have an insufficiency of firm power in every subsequent year. *Id.*

---

*ministration*, 227–236 (1981). The Agreement embraces hydro-power producers in the Columbia River basin, including BPA, plus the Army Corps of Engineers. Compl. ¶ 22; Hr'g Tr. at 28–30; *Columbia River Power for the People* at 218–220. SCE is not a party to the PNW Coordination Agreement. Compl. ¶ 23.

5. BPA clarified that the Pacific Northwest Electric Power and Conservation Planning Council ("Power Planning Council" or "Council") issues, on an annual basis, amendments to the regulations governing the operation of the Columbia River hydropower system. Hr'g Tr. at 27–30. The Council is a regional entity created pursuant to a federal statute, with membership consisting of representatives of affected states. *See* 16 U.S.C. § 839b(a). By statute, the Power Plan-

ning Council "shall not be considered an agency or instrumentality of the United States for purpose of any Federal law," "except as otherwise provided in [16 U.S.C. §§ 839–839h]." 16 U.S.C. § 839b(a)(2)(A)(iv). Counsel for BPA portrayed the annual amendments that the Council publishes as "the end product of the [PNW Coordination Agreement] process." Hr'g Tr. at 27.

6. Neither the Complaint nor the incorporated materials disclose which two years these were.

7. The 1995 Biological Opinion is addressed extensively in the Complaint. Compl. ¶¶ 33–34, 46, 58, 71. The Court has taken judicial notice of the Opinion as an adjudicative fact, *see* Fed. R.Evid. 201, without objection by either party. Hr'g Tr. at 23–24.

On August 1, 2000, BPA informed SCE that it would convert the Contract to exchange mode for the 2000–2001 operating year. Compl. ¶¶ 5, 39. BPA informed SCE that the conversion was due to a surplus firm power insufficiency and that the conversion was being made pursuant to Subsection 6(b) of the Contract. *Id.* ¶ 5. The notice in August followed a preliminary notice in March in which BPA stated it would continue the Contract in sales mode for the next year and a notice in June that changed BPA's prediction, stating that there was a strong likelihood that BPA would experience an insufficiency.[8] *Id.* ¶¶ 36, 38. The conversion for the 2000–2001 operating year occurred in the midst of the California energy crisis of 2000, during which the prices for energy in the spot and forward markets rose considerably above the price that SCE would normally pay under the Contract. Compl. ¶ 5; Claim at 7–10.

SCE alleges that BPA had experienced insufficiencies of a greater magnitude in prior years and breached the Contract by not converting in those years pursuant to its obligation under Subsection 6(b). Compl. ¶¶ 39, 46. SCE also alleges that BPA breached its implied duties to act in good faith and to disclose superior knowledge by failing to give notice of the 1995 Biological Opinion and BPA's own decisions not to convert in prior years. Compl. ¶¶ 55–64. Finally, SCE asserts that BPA should be estopped from relying on a determination of insufficiency to justify the conversion in 2000 because of BPA's wrongdoing related to its failure to adhere to the Contract through the 1990s. Compl. ¶¶ 66–73.

## DISCUSSION

### A. JURISDICTION

SCE has claimed that this Court has jurisdiction over this matter pursuant to the Tucker Act, 28 U.S.C. § 1491, and Sections 6 and 10 of the Contract Disputes Act ("CDA"), 41 U.S.C. §§ 605, 609. Compl. ¶ 8. The government has not contested jurisdiction. The Court nonetheless has an indepen-

dent obligation to satisfy itself that jurisdiction exists over the claims presented by the Complaint. *See Fanning, Phillips & Molnar v. West,* 160 F.3d 717, 720 (Fed.Cir.1998). The Court may make a *sua sponte* inquiry into its own subject matter jurisdiction at any time. *Id.* Because this Court's subject matter jurisdiction over actions taken by BPA in the context of a contract might be subject to displacement under statutory provisions that provide for exclusive jurisdiction in the Court of Appeals for the Ninth Circuit over review of certain actions by BPA, this Court has undertaken an examination of its own jurisdiction. For the reasons that follow, the Court is satisfied that it has jurisdiction to hear and decide the claims made by SCE.

### 1. *The Bonneville Power jurisdictional statutes.*

BPA is somewhat unusual among federal entities, in that many of its actions may be reviewed only by the U.S. Court of Appeals for the Ninth Circuit. The Northwest Power Planning Act specifies that eight particular categories of actions by BPA or the Power Planning Council are "final actions subject to judicial review," 16 U.S.C. § 839f(e)(1), and that such review, as well as review of other "decisions" taken pursuant to the Northwest Power Planning Act, is to be had "in the United States court of appeals for the region," *i.e.,* the U.S. Court of Appeals for the Ninth Circuit. 16 U.S.C. § 839f(e)(5). In short, the Court of Federal Claims may exercise its jurisdiction over contract and other claims under the Tucker Act only where the Ninth Circuit is not vested with exclusive jurisdiction under the Northwest Power Planning Act. *Compare Transmission Agency of N. Cal. v. Sierra Pacific Power Co.,* 295 F.3d 918, 925–27 (9th Cir.2002) (claims of breach of contract and inverse condemnation could not be separated from a BPA action subject to Ninth Circuit's exclusive jurisdiction), *cert. denied,* —— U.S. ——, 123 S.Ct. 2272, 156 L.Ed.2d 129 (2003) *with Public Util. Dist. No. 1 v. Johnson,* 855 F.2d 647, 650 (9th Cir.1988) (claim of breach of con-

---

8. SCE avers that the change in BPA's estimate was based on a modification of the "regulation" issued on April 18, 2000. *See* Compl. ¶¶ 37–38.

tract that was not final action subject to Ninth Circuit's review jurisdiction should be heard in Claims Court).

The list in the Northwest Power Planning Act of eight "final actions" specifically deemed subject to judicial review consists of the following:

(A) adoption of the plan or amendments thereto by the Council under section 839b of this title, adoption of the program by the Council, and any determination by the Council under section 839b(h) of this title;

(B) sales, exchanges, and purchases of electric power under section 839c of this title;

(C) the Administrator's acquisition of resources under section 839d of this title;

(D) implementation of conservation measures under section 839d of this title;

(E) execution of contracts for assistance to sponsors under section 839d(f) of this title;

(F) granting of credits under section 839d(h) of this title;

(G) final rate determinations under section 839e of this title; and

(H) any rule prescribed by the Administrator under section 839e(m)(2) of this title.

16 U.S.C. § 839f(e)(1). The statutory grant of jurisdiction to the Ninth Circuit to review these actions, along with other "decisions of BPA," is couched in ambiguous terms:

*Suits to challenge* the constitutionality of this chapter, or any action thereunder, *final actions and decisions taken pursuant to this chapter by the Administrator or the Council, or the implementation of such final actions*, whether brought pursuant to this chapter, the Bonneville Project Act [16 U.S.C. §§ 832–832m], the Act of August

31, 1964 (16 U.S.C. 837–837h), or the Federal Columbia River Transmission System Act (16 U.S.C. 838 and following), *shall be filed in the United States court of appeals for the region.*

16 U.S.C. § 839f(e)(5) (emphasis added). The jurisdictional uncertainty resulting from these words is exacerbated by a subsequent provision of this same statutory paragraph that preserves the jurisdiction of this and other courts: "Suits challenging *any other actions* under this chapter shall be filed in the appropriate court." *Id.* (emphasis added). The complex statutory framework governing BPA contributes to the problem of interpreting these ambiguous jurisdictional provisions.

BPA's mandate includes implementing conservation measures and mitigating harm and damage to fish, wildlife, and other national resources, as well as operating facilities for the generation of electricity. *See, e.g.,* 16 U.S.C. §§ 832, 839, 839b, 839d. BPA is to operate in a "sound and businesslike manner," 16 U.S.C. § 839f(b), while abiding by numerous statutory directions designed to establish a priority for the demands on BPA's often limited supply of power. *See M–S–R Pub. Power*, 297 F.3d at 836–37. In general, when selling power, BPA is obliged to give "preference and priority" to public bodies and cooperatives, 16 U.S.C. §§ 832c, 839c, and to the needs of the Pacific Northwest over users outside that region. 16 U.S.C. §§ 832m(b)(1), 837a, 837b. However, BPA is authorized to sell "surplus" power to customers outside the region, including investor-owned public utilities, subject to certain restrictions. *See M–S–R Pub. Power*, 297 F.3d at 837.[9] Importantly, "surplus pow-

---

9. The Administrator of BPA is authorized to enter into binding, enforceable contracts for the sale of electric energy "to public bodies and cooperatives and to private agencies and persons" for periods up to twenty years:

Contracts entered into under this subsection shall be binding in accordance with the terms thereof and shall be effective for such period or periods, including renewals or extensions, as may be provided therein, not exceeding in the aggregate twenty years from the respective dates of the making of such contracts.

16 U.S.C. § 832d(a). For a contract with an electric utility such as SCE, BPA was obliged to

include a contractual provision allowing BPA to terminate the contract on five years' notice to protect the preferential rights of public bodies and cooperatives:

if in the judgment of the administrator any part of the electric energy purchased under such contract is likely to be needed to satisfy the requirements of the said public bodies or cooperatives referred to in this chapter, and that such cancellation may be with respect to all or any part of the electric energy so purchased under said contract to the end that the preferential rights and priorities accorded pub-

er is delivered only on a provisional basis, allowing BPA to recall surplus power deliveries or cancel future ones when necessary to meet the energy requirements of Pacific Northwest customers." *M–S–R Pub. Power,* 297 F.3d at 837 (citing 16 U.S.C. §§ 837b(a)-(b), 839f(c)).[10]

The restrictions on BPA's authority to sell power provide a context for the inclusion of specific clauses in the listing of final actions subject to judicial review under 16 U.S.C. § 839f(e)(1). Correspondingly, they help explain and decipher the alternative sale-or-exchange modes of the Contract between SCE and BPA, as well as other provisions in the Contract.

Manifestly, certain actions by BPA were simultaneously important to the implementation of BPA's contract with SCE and arguably embraced in the "final actions and decisions" subject to exclusive review in the Ninth Circuit. Those actions include the adoption by the Power Planning Council of annual "amendments," which could be considered an "adoption of the plan or amendments thereto by the Council under section 839b of this title" within the meaning of 16 U.S.C. § 839f(e)(1)(A), in addition to being determinative of the Contract's operating mode, as discussed *infra* at 12–15. Arguably, such actions also include BPA's entry into the Contract with SCE in 1988, which could be deemed an instance of "sales, exchanges, and

purchases of electric power under section 839c of this title" within the meaning of 16 U.S.C. § 839f(e)(1)(B).

Nonetheless, no specific action taken by BPA to carry out its responsibilities under the Contract is either covered explicitly by the listing of "final actions" in Section 839f(e)(1) or embraced within a "decision[ ]" within the meaning of Section 839f(e)(5) akin to a "final action." Instead, while the contractual terms might have a foundation and footing in the statutorily mandated actions and restrictions, they have an independent nature and character particular to this Contract. BPA is authorized to create such extra-statutory obligations for itself by a statutory provision calling upon the Administrator of BPA to include in contracts with utilities terms that he or she deems "necessary, desirable or appropriate to effectuate the purposes of [the Bonneville Project Act]." 16 U.S.C. § 832d(a).[11]

Consequently, the jurisdiction of this Court under the Tucker Act and the Contract Disputes Act is neither ousted nor supplanted by the jurisdiction of the Ninth Circuit under 16 U.S.C. § 839f(e)(5). As the Federal Circuit has held, contract claims against BPA fall within the exclusive jurisdiction of the Ninth Circuit when BPA's actions under a contract are mandated by statute or involve a rate set by BPA pursuant to statutory requirements. *Burbank,* 273 F.3d at

lic bodies and cooperatives under this chapter shall at all times be preserved. *Id.*

**10.** Section 839c(b)(2) expressly states that "[c]ontracts with investor-owned utilities shall provide that the Administrator may reduce his obligations under such contracts in accordance with section 5(a) of the Bonneville Project Act of 1937 [16 U.S.C. § 832d(a) ]." Section 832d(b) in turn specifies that "[t]he administrator is authorized to enter into contracts with public or private power systems for the mutual exchange of unused excess power upon suitable exchange terms for the purpose of economical operation or of providing emergency or break-down relief."

Because of the restrictions on the sale of "surplus" power, it became difficult to sell. *M–S–R Pub. Power,* 297 F.3d at 837. Congress responded by passing the Excess Federal Power Act as part of the Water Development Appropriations Act of 1996, 16 U.S.C. § 832m, that "created a subspecies of surplus power called 'excess feder-

al power.' " *M–S–R Pub. Power,* 297 F.3d at 837. That power could be sold to non-regional customers without the statutory restrictions that applied to sale of traditional surplus power. *Id.* Because the Contract at issue in this case predated the Excess Federal Power Act, it had to be implemented in light of the restrictions on "surplus" power, absent novation or amendment after the Excess Federal Power Act.

**11.** The full text of this provision is as follows:

Contracts entered into with any utility engaged in the sale of electric energy to the general public shall contain such terms and conditions, including among other things stipulations concerning resale and resale rates by any such utility, as the administrator may deem necessary, desirable or appropriate to effectuate the purposes of this chapter and to insure that resale by such utility to the ultimate consumer shall be at rates which are reasonable and nondiscriminatory.
16 U.S.C. § 832d(a).

1379. Although the statutes governing BPA's activities require that BPA give preference to Pacific Northwest customers and not sell power outside of its home region except when it has a surplus, 16 U.S.C. §§ 837b, 837c, the contractual obligations it entered into with SCE were not specifically mandated by statute to achieve those goals. *See Burbank,* 273 F.3d at 1379–81 (finding that the Court of Federal Claims had jurisdiction over a dispute between the City of Burbank and BPA over a power supply contract and explaining that "[a]lthough the BPA is required to include a provision providing for price adjustment, the particular content of the price adjustment, including the manner in which the price is to be adjusted, is not statutorily mandated."). *See also Transmission Agency of N. Cal.,* 295 F.3d at 925–926 (finding Ninth Circuit jurisdiction over breach of contract claim where the actions that allegedly breached the contract constituted a final agency decision reviewable only by the Ninth Circuit).[12] Thus, this Court has subject matter jurisdiction so long as the requirements of the Contract Disputes Act are met.

### 2. *The jurisdictional provisions of the Contract Disputes Act.*

For this Court to have subject matter jurisdiction over a contract claim pursuant to the CDA, the plaintiff must have filed a written claim with the appropriate contracting agency's contracting officer, 41 U.S.C. §§ 605(a), 609, and that claim must have been denied, *id.* § 605(b), or be deemed denied due to a lapse of time without any decision. *Id.* § 605(c)(5). *See Case, Inc. v. United States,* 88 F.3d 1004, 1008–09 (Fed. Cir.1996). *See also Clearwater Constructors v. United States,* 56 Fed.Cl. 303, 308 (2003); *Mark Smith Constr. Co. v. United States,* 10 Cl.Ct. 540, 546 (1986). On May 10, 2002, SCE submitted a written claim for breach of

contract to the contracting officer at BPA, as required by the CDA. Compl. ¶ 9. *See* 41 U.S.C. § 605(a). Here, the deemed-denied doctrine is invoked by SCE. Compl. ¶ 11. On July 2, 2002, the contracting officer notified SCE that he would issue a final determination by September 30, 2002. Compl. ¶ 10. Thereafter, on September 23, 2002, the contracting officer informed SCE that he was consolidating SCE's claim with another claim and that a final decision would be issued on both claims by January 31, 2003. Compl. ¶ 10. SCE filed its complaint with the Court on December 26, 2002, roughly a month prior to the contracting officer's extended target for issuing a decision.

It is not evident from the materials before the Court whether the contracting officer ever issued a final decision. When a contracting officer fails to issue a final decision on a claim within the time period prescribed by the CDA, this Court deems such inaction a denial of the claim. 41 U.S.C. § 605(c)(5); *Case, Inc.,* 88 F.3d at 1008–09. For claims in excess of $100,000, the CDA does not set a specific time period within which a contracting officer must make a decision. 41 U.S.C. § 605(c)(2). Rather it permits the contracting officer, within sixty days of the filing of the claim, either to issue a decision or to notify the claimant of when the final decision eventually will be issued. *Id.* Because BPA's contracting officer failed to render a final decision on SCE's claim within the time period specified in the notice of July 2, 2002, the Court deems the inaction as a denial of SCE's claim. This Court thus has jurisdiction under the Contract Disputes Act and the Tucker Act.

### B. STANDARD FOR DECISION

A federal court's review of a complaint on a motion to dismiss is a limited one, focusing not on " 'whether a plaintiff will ultimately

---

**12.** Furthermore, BPA's actions in this case are not the type of administrative action which a court of appeals is situated to consider. *See Public Util. Dist. No. 1,* 855 F.2d at 650 ("Direct review by an appellate court of agency action based upon an administrative record is appropriate and can be expeditious. Cases requiring the development of a de novo record, on the other hand, should be considered in the first instance

by a trial court .... We therefore hold that claims involving alleged contractual breaches by the agency and based on allegations of facts outside an administrative record must be heard in the claims court."). *See also* John L. Schilling, Comment, *Where is the "Appropriate Court"?: Original Jurisdiction Under the Northwest Power Act,* 25 Gonz. L.Rev. 119, 130–134 (1989).

prevail but whether the claimant is entitled to offer evidence to support the claims.'" *Pi Elecs. Corp. v. United States,* 55 Fed.Cl. 279, 284–85 (2003) (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)). "'[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Pi Elecs.,* 55 Fed.Cl. at 285 (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). Under Rule 12(b)(6), a court must accept as true the facts alleged in the complaint, *Pi Elecs.,* 55 Fed.Cl. at 285 (citing *Davis v. Monroe County Bd. Of Educ.,* 526 U.S. 629, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999)), and must construe all reasonable inferences in favor of the non-movant, *Pi Elecs.,* 55 Fed.Cl. at 285 (citing *Sommers Oil Co. v. United States,* 241 F.3d 1375, 1378 (Fed.Cir.2001)). Applying this standard to the allegations set forth in the Complaint, the Court holds that SCE has met its pleading burdens and denies the government's motion to dismiss.

## C. SCE'S CONTRACT CLAIMS

### 1. *Breach of Contract.*

#### (a). *Mandatory nature of conversions under Subsection 6(b) of the Contract.*

SCE alleges that BPA breached the express terms of the Contract during the 1990s by not converting to the exchange mode in multiple years despite determinations under the PNW Coordination Agreement planning process that BPA would have a firm surplus power insufficiency. Compl. ¶ 46. SCE asserts that the plain language of Subsection 6(b) of the Contract created an obligation on BPA to convert whenever the process resulted in a determination that BPA would have an insufficiency and that each failure by BPA to convert was a breach. Compl. ¶¶ 24, 29, and 46. SCE further alleges that the series of breaches through the 1990s coupled with the conversion in 2000 resulted in damages to SCE in excess of $185 million. Compl. ¶¶ 50–51.

The government contends (1) that the Contract gave BPA discretion to determine in each and every year whether the Contract would convert and (2) that conversion was not wholly dependent upon the results of the PNW Coordination Agreement planning process. Motion at 21. BPA also argues that in 2000 it was permitted to convert to exchange mode because the PNW Coordination Agreement process showed that BPA would have an insufficiency for the 2000–2001 operating year. *Id.* at 14–16.

The dispute on this issue, whether the Contract would operate in a sale or exchange mode in a given year, boils down to differing interpretations of one clause of the Contract. The interpretation of a contract "begins with the language of the written agreement." *Coast Fed. Bank, FSB v. United States,* 323 F.3d 1035, 1038 (Fed.Cir.2003) (citing *Foley Co. v. United States,* 11 F.3d 1032, 1034 (Fed.Cir.1993)). "Where … the provisions of the Agreement are phrased in clear and unambiguous language, they must be given their plain and ordinary meaning, and [the court] may not resort to extrinsic evidence to interpret them." *Id.* (citing *McAbee Constr. Inc. v. United States,* 97 F.3d 1431, 1435 (Fed.Cir.1996)). Conversely, where an agreement presents ambiguities, a court may consider extrinsic evidence to interpret the agreement and discern the parties' intent or to determine whether an ambiguity actually exists. *See Sterling Sav. v. United States,* 57 Fed.Cl. 445, 452 (2003) (citing *Metric Constructors, Inc. v. Nat'l Aeronautics and Space Admin.,* 169 F.3d 747, 752–53 (Fed. Cir.1999)); *Veit & Co. v. United States,* 56 Fed.Cl. 30, 35 (2003). Contract interpretation is a matter of law and thus may be addressed by the Court in resolving a motion to dismiss. *Kennedy Heights Apartments, Ltd. I v. United States,* 48 Fed.Cl. 574, 578 (2001).

The relevant portion of the Contract provides:

*Conversion Upon Surplus Firm Power Insufficiency*

The sale of surplus firm power *shall* convert in whole or in part to an exchange if Bonneville has a surplus firm power insuf-

ficiency as determined in the PNW Coordination Agreement planning process.

Contract § 6(b) (emphasis added). In support of SCE's position, the contract language ("shall") indicates that the conversion was intended to be mandatory if and when the "power insufficiency" condition was met. *See Black's Law Dictionary* 1233 (5th ed. 1979) ("[T]he term 'shall' is a word of command, and one which has always or which must be given a compulsory meaning; as denoting obligation .... It has the invariable significance of excluding the idea of discretion."). However, BPA points to other portions of the Contract where some discretion was given and urges that these provisions show that it had discretion over the conversion decision. Motion at 28–33.

BPA refers to Paragraphs 6(b)(1) and 6(b)(2) of the Contract, which required BPA to give preliminary notice to SCE of "Bonneville's *assessment of the likelihood* that there will be sufficient surplus firm power" for the coming year. Reply at 4–5 (emphasis added). BPA also cites to Paragraph 6(b)(3) in support of its contention, which required BPA to give final notice in August, once all calculations and forecasts had been made, of "whether Bonneville has sufficient surplus firm power." Motion at 30; Reply at 5. BPA interprets this clause as referring to whether "*Bonneville* determines that it possesses 'sufficient surplus firm power.'" Reply at 5 (emphasis in original). Unlike Paragraphs 6(b)(1) and 6(b)(2), however, Paragraph 6(b)(3) does not speak of "Bonneville's assessment of ... likelihood" but rather addresses the actual determination of insufficiency by using the same verb as the preamble to Subsection 6(b)— "has." The preamble to Subsection 6(b) provides that whether "Bonneville has [*i.e.*, had] a surplus firm power insufficiency" was to be "determined in the PNW Coordination Agreement planning process."[13]

BPA also refers to Section 5 of the Contract to support its interpretation. Motion at 31. The preamble to Section 5 provides that "Bonneville shall not be obligated to acquire resources to delay [a] conversion [to ex-

---

**13.** BPA also makes passing reference to Paragraph 6(b)(4), which addresses a partial conversion to exchange mode:

(4) *Partial Conversion.*
If Bonneville determines that the planning insufficiency above is such that less than 100 percent but greater than 50 percent of the monthly amount of energy for any month in Edison's effective plan of delivery for the current Delivery Year, determined in accordance with section 5(c), is available for a power sale to Edison under this Agreement, Bonneville *shall* continue to sell 50 percent of the Annual Amount of Energy, at the maximum rate of delivery of one-half the Contact Demand and 50 percent of the Contract Demand shall convert to the exchange. If Bonneville determines that 50 percent or less of the monthly amount of energy for any month is available, the power sale *shall* convert in whole to the exchange. Other amounts may be agreed to by the Authorized Representatives.
If on an annual basis Bonneville may have sufficient surplus firm power to meet 50 percent or 100 percent of the Annual Amount of Energy, but not sufficient to meet each monthly amount of Edison's Plan of Delivery, consistent with the limits in section 5(b), revisions in Edison's plan of delivery may be agreed to by the Authorized Representatives such that all Edison's monthly amounts are within Bonneville's monthly amounts of surplus firm power availability.

If during any period both power sale and exchange occur, pertinent provisions of this Agreement that relate to amounts of the power sale or exchange *shall* be adjusted proportionately. Examples of this adjustment are provided in Exhibit D.

(Emphasis added.) The language of this provision, however, uses the mandatory word "shall" to govern partial sales and exchanges if certain conditions are met. The context thus tends to confirm that conversion was mandatory, not discretionary, if a power insufficiency was determined in the PNW Coordination Agreement planning process. The parties have advised that there was never a partial conversion under the Contract. Hr'g Tr. at 18.

The government also refers to Paragraph 6(b)(6), noting that should the PNW Coordination Agreement have lapsed, BPA would have been bound to "use a similar planning process when making determinations of surplus firm power insufficiency." Motion at 31 n. 10. This clause suggests that as long as the PNW Coordination Agreement was in place, it should have been the basis for such determinations. Only if the PNW Coordination Agreement were to have lapsed would BPA have been given authority to make such determinations, but even then it would have still been obliged to act within the constraint of a comparable objective standard. It would not be logical to interpret this clause as requiring BPA to be bound by the objective standards of the PNW Coordination Agreement only if that agreement should cease to operate.

change mode]." The government argues that "the converse of this contract provision allow[ed] BPA to delay conversion to the exchange mode by acquiring other resources should it determine that such action is in its best interests" and that this implied aspect of the clause should not be interpreted out of the Contract. Motion at 31–32.

The different portions of a contract should be read as whole to give meaning to all of its parts, with fidelity to the plain language of the contract. *Veit*, 56 Fed.Cl. at 35 ("The Court is to attempt to avoid an interpretation that leaves a portion of the contract 'useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result.' ") (quoting *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir.1991)); *Kennedy Heights*, 48 Fed.Cl. at 578. Reading the word "shall" in Subsection 6(b) in its normal sense as mandatory and not discretionary would not render any other portions of the Contract meaningless. Indeed, an interpretation of Subsection 6(b) in mandatory terms is supported by a straightforward interpretation of Section 5 that BPA need never have acquired electric power from other sources to delay an otherwise mandatory conversion. However, applying the government's interpretation of Section 5 to infuse discretion into Subsection 6(b) would render the term "shall" in Subsection 6(b) meaningless.[14] Accordingly, based on the language of Subsection 6(b), the Contract did not give BPA a free hand to decide for itself when and whether to convert to exchange mode.[15]

The reliance on the annual results of the PNW Coordination Agreement built into Subsection 6(b), however, creates a latent ambiguity that cannot be resolved by the Court at this stage of the proceedings. *See Veit*, 56 Fed.Cl. at 35. The PNW Coordina-

tion Agreement exists and is implemented independently of this Contract, and the actual year-by-year results of the PNW Coordination Agreement planning process are not now before the Court. Assuming, solely for purposes of the pending motion, that there is a clear-cut annual determination of sufficiency or insufficiency under the process, the Court interprets the Contract to provide that the conversion from sales mode to exchange mode was mandatory when an insufficiency was forecast. Thus, SCE's allegations that BPA failed to convert when required to do so are adequate to state a claim for breach of the Contract. However, due to the latent ambiguity about the PNW Coordination Agreement planning process and its results, the Court withholds making any further determination regarding these aspects of the Contract until a factual record becomes available.

### (b). *Damages, causation, and foreseeability.*

BPA points out that although most of the alleged breaches occurred in the 1990s, the damages that SCE is claiming were incurred in 2000. Motion at 16–25; Reply at 2–3, 6–8. BPA asserts that damages must be a direct result of a given breach in order for a plaintiff to recover. SCE counters by arguing that (1) BPA did breach the contract in 2000, (2) BPA's actions constituted a continuing pattern of concealment and misrepresentation that directly caused SCE's injuries, and (3) damages do not have to follow a breach immediately to be recoverable.

As a matter of law, BPA is correct that some consequential damages may be too remote to be recovered. *See generally* 24 Richard A. Lord, *Williston on Contracts* §§ 64:12, 64:13, 66:57 4th ed. (2002). *See also Northern Helex Co. v. United States*, 207 Ct.Cl. 862, 524 F.2d 707, 720 (1975) (" 'In

---

14. BPA's interpretation of its contract with SCE is not entitled to deference. "When a party enters into a contract with the government, that party should reasonably expect to be on equal legal footing with the government should a dispute over the contract arise." *Southern California Edison Co. v. United States*, 226 F.3d 1349, 1357 (Fed.Cir.2000) ("*deference could lead the courts to endorse self-serving post-hoc reinterpretations of contracts that an agency might offer in the context of a litigation*").

15. Furthermore, accepting the government's interpretation that the Contract gave BPA unfettered discretion to determine the mode in which the Contract would operate would undermine the existence of a contract. *See Torncello v. United States*, 231 Ct.Cl. 20, 681 F.2d 756, 760 (1982) ("[A] party may not reserve to itself a method of unlimited exculpation without rendering its promises illusory and the contract void.").

actions for breach of contract the damages are ordinarily limited to the natural and probable consequences of the breach complained of.'") (quoting *Ramsey v. United States,* 121 Ct.Cl. 426, 101 F.Supp. 353, 357 (1951)); *Wells Fargo Bank, N.A. v. United States,* 88 F.3d 1012, 1021 (Fed.Cir.1996) ("'[R]emote and consequential damages are not recoverable in a common-law suit for breach of contract ... especially ... in suits against the United States for the recovery of common-law damages'") (quoting *Northern Helex,* 524 F.2d at 720).[16] General damages may be recovered upon a showing that the plaintiff's injury was directly caused by the defendant's breach. 24 *Williston on Contracts,* §§ 64:1, 64:8, 64:12. SCE notes that courts have allowed recovery even in the face of a long temporal gap between breach and injury. Opp. at 28–31 (referring to *Beverly v. National Flood Insurers Assoc.,* 702 F.2d 931 (11th Cir.1983), and *Hughes Communications Galaxy Inc. v. United States,* 271 F.3d 1060, 1066 (Fed.Cir.2001)).

SCE has alleged that its injuries were caused "[a]s a proximate result of the actions of BPA." Compl. ¶¶ 51, 64. In the context of a motion to dismiss, this is adequate. *See San Carlos Irrigation and Drainage Dist. v. United States,* 877 F.2d 957, 959 (Fed.Cir. 1989) ("Because the [plaintiff] alleged that the government has breached certain contractual duties and that damages occurred as a result of those breaches, the [plaintiff] has properly stated a claim for which relief can be granted."). The issues of causation and foreseeability, as well as SCE's reliance on BPA's prior acts over the course of performance of the Contract, what other options were reasonably available to SCE, and whether SCE would have or could have made different decisions, are all fact-based questions that cannot be decided at this stage of the proceedings. SCE has alleged sufficiently that its damages were the direct result of BPA's alleged breaches, and, accordingly, the government's motion in this respect cannot be granted.

*2. Breach of implied covenants.*

■ SCE asserts that in addition to the breaches of specific contractual obligations, BPA breached its implied obligation to act in good faith when BPA affirmatively misrepresented or concealed from SCE (1) the effects of the 1995 Biological Opinion on the PNW Coordination Agreement planning process and (2) the actual factors upon which BPA was basing its decisions whether to convert. Compl. ¶¶ 33, 58, 46(c). SCE contends that had it known of these matters, it might have terminated the Contract or sought alternative means to ensure a long-term supply of energy thus reducing its expenses during the energy shortage of 2000. Compl. ¶¶ 4, 34, 44.

SCE asserts that the Contract was originally premised upon use of a 42–month critical-period in the PNW Coordination Agreement planning process. As SCE would have it, the length of this critical-period was significantly reduced by the 1995 Opinion, effectively altering the PNW Coordination Agreement planning process to reduce the amount of energy that SCE would reliably be able to receive under the Contract. *Id.* ¶ 33. SCE does not specify any provision of the Contract that creates an express obligation on BPA to provide such detailed information about the planning process, and BPA argues that it had no such obligation.

The language of the Contract, on its face, created an obligation on BPA to inform SCE of "amendments" to the PNW Coordination Agreement if such amendments "would reduce or eliminate the availability of the Annual Amount of Energy." Contract § 6(b)(6). Nothing in the pleadings suggests that the 1995 Biological Opinion, generated independently of the Contract and by a non-associated third party, would be considered an "amendment" under the terms of the PNW Coordination Agreement. Absent a showing that the 1995 Biological Opinion constituted an amendment to the PNW Coordination Agreement, therefore, the Contract would not create an express duty on BPA to

---

**16.** These cases were decided on a full factual record. *Northern Helex,* 524 F.2d at 709 ("[a] trial was held on this issue"); *Wells Fargo,* 88 F.3d at 1017–18 (liability decided on a motion for partial summary judgment with "a separate trial for damages").

disclose to SCE the existence or effects of the 1995 Biological Opinion.

SCE, however, has also alleged that the BPA had an implied duty of good faith and fair dealing to cooperate with SCE regarding the Opinion and its effects on the planning process and the annual determinations of sufficiency, especially where BPA was not basing conversion *vel non* on the PNW Coordination Agreement process. "[I]n every contract there exists an implied covenant of good faith and fair dealing." 13 *Williston on Contracts* § 38:15 at 437. *See also Asco–Falcon II Shipping Co. v. United States*, 32 Fed.Cl. 595, 604 (1994); *Solar Turbines, Inc. v. United States*, 23 Cl.Ct. 142, 156 (1991); *Travelers Indemn. Co. v. United States*, 16 Cl.Ct. 142, 149 (1988). Proving a breach of this covenant in a government contract is frequently difficult because of the presumption that a government employee performs his or her duties in good faith. *See generally* John W. Whelan, *Understanding Federal Government Contracts*, 68–70 (1993). "[S]ince good faith is presumed unless bad faith is shown, the government is prevented only from engaging in actions motivated by a specific intent to harm plaintiff'.... Thus, in order to state a claim premised on a violation of the obligation of good faith and fair dealing, plaintiffs must allege facts which if proved would constitute malice or an intent to injure." *Asco–Falcon*, 32 Fed.Cl. at 604 (quoting *Torncello*, 681 F.2d at 771). *See also Torncello*, 681 F.2d at 770 (The government "is assumed always to act in good faith, subject only to an extremely difficult showing by the plaintiff to the contrary.").

However, difficult is not the same as impossible. *See Hubbard v. United States*, 52 Fed.Cl. 192, 196 (2002) ("evidence adduced at trial strongly demonstrates that the [government's action] was effected in bad faith"). SCE has alleged that BPA intentionally misrepresented facts to SCE, intentionally withheld material information, and took affirmative actions to protect its own interests at the expense of SCE over the course of a decade. *E.g.*, Compl. ¶¶ 3–5, 28–29, 31, 34, 46(b), 48, 56, 59–61, 69. These allegations suffice to state a claim for breach of the implied covenant of good faith and fair dealing.

■ Furthermore, the government has long been held to have an implied affirmative duty, closely related to the implied covenant of good faith and fair dealing, to disclose superior knowledge that is required for the performance of a contract to which it is a party. *Miller Elevator Co. v. United States*, 30 Fed.Cl. 662, 674–75 (1994). This duty obtains when the following four prerequisites are met: " '(1) [the contractor] undertook to perform without vital knowledge of a fact that affects performance costs or direction, (2) the government was aware the contractor had no knowledge of and had no reason to obtain such information, (3) any contract specification supplied misled the contractor, or did not put it on notice to inquire, and (4) the government failed to provide the relevant information.' " *AT & T Communications, Inc. v. Perry*, 296 F.3d 1307, 1312 (Fed.Cir. 2002) (quoting *GAF Corp. v. United States*, 932 F.2d 947, 949 (Fed.Cir.1991)). *See also Petrochem Servs., Inc. v. United States*, 837 F.2d 1076, 1079 (Fed.Cir.1988); *Helene Curtis Indus., Inc. v. United States*, 160 Ct.Cl. 437, 312 F.2d 774, 777–78 (1963); *Miller Elevator Co.*, 30 Fed.Cl. at 675. The showing of malice or bad faith required to establish a breach of the covenant of good faith and fair dealing has no counterpart in connection with showing a breach of the government's duty to disclose arising from superior knowledge; rather, the latter inquiry focuses on the government's knowledge vis-a-vis the contractor's lack of knowledge. *See Max Jordan Bauunternehmung v. United States*, 10 Cl.Ct. 672, 679 (1986) ("The government's liability for failure to provide information arises from a conscious omission to share superior knowledge it possesses in circumstances where it permits a contractor to pursue a course of action known to be defective."), *aff'd*, 820 F.2d 1208 (Fed.Cir.1987).

■ The allegations in SCE's Complaint invoke each of the factors relevant to applying the superior-knowledge tests. First, SCE continued to perform under the Contract throughout the 1990s and into the 2000–2001 operating year without knowledge of the alleged effects of the 1995 Biological Opinion or of BPA's alleged decision-making process related to conversion, and SCE has

averred that its continued performance under the Contract caused increased costs and damages. Compl. ¶¶ 4, 29, 34, 44, 47. SCE has alleged that BPA knew, while SCE did not know, of the 1995 Biological Opinion, of its effects on the PNW Coordination Agreement planning process, and of the factors that went into BPA's own decision-making process related to the annual conversion decisions in the 1990s. Id. ¶¶ 3, 4, 23, 28. SCE has averred that BPA knew of SCE's ignorance, that BPA failed to inform SCE, and that BPA took affirmative steps to conceal information from SCE. Id. ¶¶ 31, 46(b), 48, 56–59. SCE has also alleged a persistent pattern of misrepresentation and concealment adequate to invoke the implied duty to disclose superior knowledge. The government's motion to dismiss this count must be denied.

### 3. Estoppel.

SCE asserts that because of BPA's failure to adhere to the contractual requirements regarding the use of the PNW Coordination Agreement process in determining whether to switch to exchange mode during the 1990s, BPA should be equitably estopped from arguing that in 2000 BPA simply relied on that process in making its decision to switch to exchange mode. Compl. ¶¶ 65–73. In moving to dismiss this count, BPA argues that it would be impossible for SCE to prove the facts required for estoppel. Motion at 26–34.

■ Just as there is a high bar associated with proving a breach of the implied covenant of good faith and fair dealing by the government, " 'the government may not be estopped on the same terms as any other litigant.' " Zacharin v. United States, 213 F.3d 1366, 1371 (Fed.Cir.2000) (quoting Heckler v. Community Health Servs., 467 U.S. 51, 60, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984)). The Court of Appeals for the Federal Circuit has explained that

> when estoppel is asserted against the government in the context of a contract dispute, the necessary elements are: (1) the

government must know the true facts; (2) the government must intend that its conduct be acted on or must so act that the contractor asserting the estoppel has a right to believe it so intended; (3) the contractor must be ignorant of the true facts; and (4) the contractor must rely on the government's conduct to his injury.

*JANA, Inc. v. United States*, 936 F.2d 1265, 1270 (Fed.Cir.1991) (citation omitted). Due to the special nature of the federal government as defendant, "affirmative misconduct is a prerequisite for invoking estoppel against the government," and so is a showing that the actions involved were within the scope of authority of the government officers undertaking them. *Zacharin*, 213 F.3d at 1371. *Cf. Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 420, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990) (government could not be estopped from denying benefits to claimant who was given erroneous advice by government employee about maximum earned income threshold); *Torncello*, 681 F.2d at 771 ("the government is prevented only from engaging in actions motivated by a specific intent to harm the plaintiff").

■ SCE has alleged facts sufficient to state a case of equitable estoppel against BPA. Averments of BPA's knowledge and SCE's concomitant ignorance are addressed above and are coupled with allegations by SCE regarding BPA's undisclosed decisions to "operationally mitigate" its power deficits and leave the Contract in sales mode. *See supra* at 322; Compl. ¶¶ 32, 61, 67. BPA's intention that SCE rely on BPA's conduct is reflected in SCE's allegation that BPA's annual notice regarding the non-conversion of the Contract to exchange mode in the 1990s stated that the decision was made pursuant to Section 6 of the Contract even when BPA was acting on factors other than the results of the PNW Coordination Agreement process.[17] *Id.* ¶ 31. SCE has also specifically alleged that "BPA intended SCE to rely on the Contract as a stable source of energy regardless of market prices so SCE would

---

**17.** The government has argued that the SCE may not prevail on this prong of the estoppel analysis based on BPA's interpretation of the discretionary nature of Section 6. Motion at 28–29. How-

ever, as explained above, the Contract was not discretionary insofar as it was keyed to the PNW Coordination Agreement planning process. *See supra* at 323.

not cancel or renegotiate the Contract when contract prices were above market prices and hence favorable to BPA." *Id.* ¶ 68. SCE has averred that it "relied on BPA's conduct to SCE's detriment" by foregoing any opportunity to cancel the Contract in favor of something more advantageous or predictable and thus incurred large expenses in the 2000 energy crisis.[18] *Id.* ¶¶ 6, 34, 72. SCE's complaint alleges affirmative misrepresentation and concealment over a decade by BPA. *E.g.,* Compl. ¶¶ 3–5, 28–29, 31, 34, 46(b), 48, 56, 59–60, 69. Finally, SCE avers that "[t]he conduct of BPA, including its misrepresentations, were made by government officers acting within the scope of their authority." *Id.* ¶ 73. Accordingly, SCE has fulfilled its pleading requirements respecting its claim of estoppel against the government, for purposes of surviving BPA's motion to dismiss.

## CONCLUSION

For the reasons stated above, the government's motion to dismiss SCE's Complaint pursuant to RCFC 12(b)(6) is DENIED. The defendant is ordered to respond to the Complaint within the time specified by RCFC 12(a)(2)(A).

---

18. The government has argued that SCE may not prevail on this prong because SCE could not reasonably have relied on BPA not to convert the Contract. Motion at 33. The factual determinations required to ascertain reasonableness and reliance, however, go beyond the scope of inquiry appropriate to consideration of a motion to dismiss. *See Scheuer v. Rhodes,* 416 U.S. at 236, 94 S.Ct. 1683; *Buesing v. United States,* 47 Fed. Cl. 621, 623 (2000) (finding no estoppel "after a trial on the merits").